**UNITED STATES of America,**

**v.**

**James R. SPEIGHT, Defendant.**

**Crim. Nos. 88–0245–LFO, 89–0152–LFO.**

United States District Court,
District of Columbia.

Dec. 12, 1989.

Judith E. Retchin, Asst. U.S. Atty., Washington, D.C., for U.S.

G. Allen, Dale, Washington, D.C., for defendant.

Herbert J. Miller, Jr., Paul F. Enzinna, Miller, Cassidy, Larroca & Lewin, Washington, D.C., amicus curiae.

## MEMORANDUM ON SENTENCING

OBERDORFER, District Judge.

Defendant, a thirty-three year old male, was charged with drug and firearm related offenses in a six-count indictment in 1988. He pled guilty to two counts of the indictment: unlawful possession with intent to distribute 50 grams or more of cocaine base (21 U.S.C. § 841(a)), and possession of firearms after conviction of a felony (18 U.S.C. § 922(g)). Crim. No. 88–0245. Defendant also pled guilty to the indictment in a related case on the single count of failure to appear (18 U.S.C. § 3146). Crim. No. 89–0152. The sentences imposed for these offenses are governed by the Federal Sentencing Guidelines. However, because defendant's long history of mental illness establishes that he acted with significantly reduced mental capacity at the time he committed the offenses, departure from the Guideline range applicable to his offenses is warranted.

Eleven years ago, defendant, then a 22–year old Staff Sergeant in the U.S. Army, began to experience mounting difficulty with mental illness. At that time, defendant had served honorably for five years and received various commendations for outstanding service. His problems with mental illness caused the Army to diagnose him as schizophrenic and to honorably discharge him on a 90% disability pension. According to a May 21, 1979 report of Medical Board Proceedings at Fort Gordon, Georgia, defendant suffered from the following medical condition:

> Schizophrenia, latent type, acute, moderate; manifested by emotional turmoil, episodic acute anxiety with hyperventilation, somatic complaints, labile affect, confusion, pressured speech, episodic outbursts of rage, fear of inability to control his thoughts; minimal precipitating stress of routine military duty; considerable predisposition of premorbid obsessive-compulsive personality ...

Report on Medical Board Proceedings, U.S. Army, Fort Gordon Georgia (May 21, 1979). Significantly, the 1979 Army report found defendant to be drug free. *Id.* at 3. In addition, the report noted that defendant suffered serious side effects from Thorazine, which was being administered to him to control his mental illness. *Id.* at 4.

The Army's diagnosis of schizophrenia was confirmed by a Veterans Administration determination that defendant was entitled to a full disability pension, of which 50 percent was attributable to mental illness. Presentence Report (July 27, 1989), at 13. Thereafter, he began to use cocaine, became addicted, and began to distribute in order to feed his habit. *Id.* at 12. A psychiatric evaluation conducted earlier this year at a hospital in North Carolina confirmed defendant's history of schizophrenia but found him to be on psychotropic medicine and in remission at the time of the examination. Psychiatric History/Evaluation & Discharge Summary of Speight, James Russell, Dorothea Dix Hospital (Apr. 18, 1989), at 3. That evaluation also noted that defendant had a history of drug abuse. *Id.* at 1, 3.

Defendant was originally sentenced on July 27, 1989. On August 1, 1989, however, the sentence imposed was vacated because of the difficult questions involved in aspects of the sentencing. An Order dated August 3, 1989 required an independent psychiatric evaluation of defendant to be performed by Dr. David Pickar, a branch chief in research psychiatry at the National Institute of Health [1] and another round of briefing on the sentencing issues. Subsequently, on September 21, 1989, the Court appointed an *amicus curiae* to file a brief on the sentencing issues, as well. Defendant was resentenced on December 1, 1989, following the submission of a presentence report and a supplemental presentence report, a psychiatric evaluation, and

---

**1.** Dr. Pickar, a graduate of Yale Medical School who completed a psychiatric residency at that institution, is a recognized expert in the diagnosis of serious mental illnesses and their treatment. Dr. Pickar runs a schizophrenia research program at the National Institute of Mental Health and has published extensively in that area. He also has expertise in the field of controlled substances and drug abuse and in the interaction between mental illness and controlled substances.

three very helpful sets of memoranda from counsel for the defendant and the government, as well as the well-reasoned and comprehensive memorandum submitted by *amicus.* The sentence imposed at that time was based on reasons stated from the bench and in a memorandum to be filed. This is that memorandum.

## I.

The offenses to which defendant pled guilty stem from a search warrant executed by the Metropolitan Police Department officers and agents of the Bureau of Alcohol, Tobacco and Firearms on June 2, 1988. On that date, police officers seized a total of 182 grams of cocaine base, narcotics paraphernalia, and two loaded firearms. Presentence Report at 3–4. Thereafter, defendant was indicted on six drug and firearm related offenses. The government agreed to dismiss the remaining charges in this case, including Count IV, which charged use of a firearm in the aid of a drug trafficking crime (18 U.S.C. § 924(c)), in return for defendant's plea of guilty on the two offenses now at issue.

Defendant's plea of guilty constitutes his third drug distribution felony. In 1982, he was convicted and pled guilty to his first such offense. At that time he enjoyed the privilege of having execution of his sentence suspended. In 1988, a few weeks after he was charged with the instant offense and was released on bond, he was arrested in North Carolina on charges of drug distribution. He pled guilty to the North Carolina offense prior to the sentencing in these cases and is presently serving a ten-year sentence in that state.

Because of the serious nature of defendant's offense and the fact that he is a repeat offender, if the Guidelines were applied without adjustment, defendant would be obligated to serve a minimum of 237 months, or 19 and 1/2 years, and a maximum of 301 months, or 25 years, with no parole for the instant crime.[2] This sentence would have to be served consecutively to his ten year North Carolina prison term, placing his total term of imprisonment at between 30 and 35 years. He would therefore be between 62 and 68 years old when released. If defendant were fully responsible for his actions incarceration for this period of approximately 35 years (inclusive of 10 years in North Carolina) plus a 5–year special parole term would be not only lawful but appropriate according to the standards that now obtain with respect to drug offenses. Harsh sentences are a necessary element in the effort to combat the scourge of drug trafficking which plagues the Nation. However, defendant's mental illness requires, and the Guidelines and relevant statutes permit, significant mitigation in his case.

At a hearing held in the course of the reconsideration of defendant's original sentence, Dr. Pickar testified that defendant, while not suffering from schizophrenia at this time, suffers from the related disorder of schizophreniform, a serious mental illness which could significantly reduce his mental capacity. Transcript at 10–11 (Oct. 23, 1989). Dr. Pickar testified that it was his expert medical opinion that this mental illness caused defendant to suffer from reduced mental capacity at the time the offenses were committed. *Id.* at 13. Dr. Pickar also noted defendant's history of drug abuse and cocaine addiction. *Id.* at 26–35, 55–56. According to Dr. Pickar, it was his opinion that defendant's mental condition and his reaction to psychotropic medication contributed to his drug use and aggravated it, and that his drug use contributed to and aggravated his mental con-

---

**2.** In Crim. No. 88–245, defendant's offense of possession with intent to distribute cocaine base must be calculated on the basis of the 182 grams of cocaine base seized by the police. This amount of cocaine base places defendant at a base level of 34. § 2D1.1(a)(3). Because the drug trafficking offense was committed while loaded weapons were present, the Guidelines would enhance the offense level by two points.

§ 2D1.1(b)(1). Defendant's offense level would therefore be raised to 36. When combined with his criminal history category of III, defendant falls into the Guideline range of 235–293 months on Counts II and V. Ch. 5, Part A. In Crim. No. 88–0245, the Guidelines require that he serve a term of 2–8 months on the related failure to appear count.

dition as well as his criminal conduct. *Id.* at 13–14, 18–19, 26–35, 46–51, 55–56.

## II.

Under the Federal Sentencing Guidelines, Count II of the indictment to which defendant pled guilty, possession with intent to distribute, places him in an offense level of 34. § 2D1.1(a)(3). In addition, defendant has two prior felony convictions that enhance his offense level. His first, for his 1982 drug distribution offense on which he was sentenced to probation, yields 1 criminal history point. § 4A1.1(c). His second, for his North Carolina offense on which he was sentenced to ten years of imprisonment, yields 3 criminal history points. § 4A1.1(a). Accordingly, defendant's total of 4 criminal history points place him in criminal history category III. His base sentence on Count II therefore falls within a Guideline range of from 188–235 months on the possession charge alone. Ch. 5, Part A.

■ The Guidelines provide for two adjustments to this base sentence that are at issue here. On the distribution charge, the Guidelines would reduce the Guideline range if defendant demonstrates acceptance of personal responsibility for his criminal conduct. § 3E1.1. Defendant's observable remorse and his forthright admission of his involvement at the time of the original sentencing on July 27, 1989, as well as his plea of guilty demonstrates his acceptance of responsibility. Moreover, defendant's conduct throughout the proceedings, and particularly his tearful reaction to Dr. Pickar's testimony about his lost opportunities in the Army as a result of mental illness provide clear indications that defendant feels strong remorse for his actions. *See* Transcript at 32 (Oct. 23, 1989). Defendant is therefore entitled to a two-point adjustment for acceptance of responsibility, reducing the applicable offense level to 32.

■ Also at issue here is an enhancement of the drug trafficking charge on account of the presence of dangerous weapons during commission of the offense. § 2D1.1(b)(1). Defendant challenges the enhancement on the ground that he pled guilty to possession of a firearm rather than to use of a firearm in aid of a drug trafficking crime. The Guidelines indicate, however, that the presence of a weapon during the commission of an offense triggers the enhancement unless it is clearly improbable that the weapon was connected with the offense. § 2D1.1, Application note 3. The unexplained presence of weapons at a home owned and controlled by defendant at which drug trafficking took place requires enhancement by two levels, restoring the offense level to 34. Defendant therefore remains within a Guideline range of 188–235 months.

## III.

The central question here is posed by defendant's contention that his mental illness warrants departure from the presumptive Guideline range. He invokes Guideline 5K2.13, which provides in full:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

Three issues arise in determining whether 5K2.13 applies to defendant: 1. whether defendant's offenses should be considered non-violent under the Guidelines; 2. whether defendant had a significantly reduced mental capacity that did not result from the voluntary use of drugs; and 3. whether defendant's criminal history indicates that incarceration is required to protect the public. Each of these issues will be considered in turn.

## A.

■ The Sentencing Guidelines state that the term "crime of violence" refers to an offense under federal or state law punishable by imprisonment for a term exceeding one year that:

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(ii) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

§ 4B1.2.(1). According to the Guidelines, this amended definition is derived from 18 U.S.C. § 924(e). App.C, n. 268. As the government concedes, neither of the offenses to which defendant pled guilty constitutes a crime of violence under this definition.

Defendant is charged with both possession with intent to distribute cocaine and possession of a weapon by a felon. Quite plainly, neither offense is the sort of violent felony referred to in 4B1.2(1)(i), for neither has as an element of the offense, as the offense is described by statute, the use—actual, attempted, or threatened—of force against the person. *See United States v. Sherbondy*, 865 F.2d 996, 1005–06 (9th Cir.1988); *United States v. Headspeth*, 852 F.2d 753, 756 (4th Cir.1988). In addition, it is clear that neither the offense of possession with intent to distribute nor the offense of possession of a weapon by a felon falls within the specific list of offenses set out in 4B1.2(1)(ii), as neither, even arguably, involves "burglary of a dwelling, arson, or extortion, [or] ... use of explosives."

Whether the offenses charged, in the language of the Guidelines, "otherwise involve[ ] conduct that presents a serious potential risk of physical injury to another," is a more difficult issue. As the Fourth Circuit stated regarding the identical language in 18 U.S.C. § 924(e)(2)(B)(ii), this catch-all language "is, in context, ambiguous." *United States v. Headspeth*, 852 F.2d at 758. Two interpretations of the phrase are possible.

The catch-all provision could be interpreted to refer only to offenses which *by their very nature* pose a risk of serious injury to others. Viewed in this light, the provision would require consideration of whether the generic charges to which defendant has

pled guilty, possession with intent to distribute and possession of a weapon by a felon necessarily involve a serious potential risk of injury. This interpretation is supported by the specifically enumerated crimes that precede the catch-all language: burglary, arson, extortion, and use of explosives are all offenses which, by their very nature, pose an inherent risk of injury to the person. *Id.*

As established by courts that have considered definitions of crimes of violence similar to that in 4B1.2(1), but which specifically define violent felonies as those which, by their very nature, necessarily involve risk of injury to another, *see* 18 U.S.C. § 16; 18 U.S.C. § 924(c), neither drug trafficking nor possession of a weapon by a felon, when considered in their generic sense, would involve such a risk of injury. *See, e.g., United States v. Cruz*, 805 F.2d 1464, 1469 (11th Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987); *Government of the Virgin Islands v. Frett*, 684 F.Supp. 1324, 1327–28 (D.V.I. 1988); *United States v. Bushey*, 617 F.Supp. 292 (D.Vt.1985). While both drug trafficking and possession of a weapon by a felon on occasion may present some risk of injury to a person, the crimes are not themselves ones that, like burglary, arson, extortion, and the use of explosives, necessarily pose such a risk *by their very nature.*

It is also possible, however, to interpret the phrase "otherwise involves conduct that presents a serious potential risk of physical injury to another" to require scrutiny, not of the generic offenses with which defendant is charged, but of the actual circumstances of the commission of the offenses. Under this interpretation, rather than consider whether generic offenses of possession with intent to distribute and possession of weapons by a felon necessarily involve risk of harm, the provision would require consideration of whether, under the particular circumstances in which defendant committed the offense, such a risk of harm was actually presented. The risk of harm would therefore be judged by the fact that defendant possessed loaded

weapons at the time he committed his drug trafficking offenses.

■ While in today's climate, few would disagree that drugs and firearms are a dangerous and volatile combination, it should be noted that such an offense is not one to which defendant has pled guilty. Defendant was originally charged with use of a firearm in aid of a drug trafficking crime (18 U.S.C. § 924(c)). However, the government voluntarily dismissed that charge after defendant's plea. Consideration of the circumstances of the actual offense rather than the offenses with which defendant was charged would undercut the plea agreement made between the government and the defendant and, as a consequence, the "charge offense" system created by the Guidelines. As frequently noted, the Guidelines are intended to sentence defendants for crimes charged, not actual conduct. *See, e.g., United States v. Roberts*, 726 F.Supp. 1359, 1363–1365 (D.D.C. 1989) (Greene, J.). Therefore, consideration of the offenses charged rather than the particular circumstances of defendant's offense would seem better to conform with the purpose of the Guidelines.

In addition, as other courts have found, the legislative history of § 924(e), on which the Guideline definition of "crime of violence" is based, supports the view that Congress intended courts to focus on the offenses charged rather than the specific conduct of defendant. As stated by the Ninth Circuit,

> Congress consistently discussed subsection (ii) in categorical terms: i.e., in terms of what offenses it would include. There is no indication that Congress intended that a particular statutory or common law crime would in some circumstances constitute a violent felony and in other circumstances not, depending upon how the offense was committed.

*United States v. Sherbondy*, 865 F.2d at 1008; *see also United States v. Taylor*, 882 F.2d 1018, 1023 (6th Cir.1989).

The legislative history of 18 U.S.C. § 924(c) and the framework of the Guidelines would thus seem to support considera-

tion of the category of offense with which defendant is charged rather than the offense as it was actually committed. Any element of ambiguity remaining must be resolved by the presupposition of our law that " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (citation omitted), *quoted in United States v. Nofziger*, 878 F.2d 442, 452 (D.C. Cir.1989). This policy embodies "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." H. Friendly, *Mr. Justice Frankfurter and The Reading of Statutes*, in *Benchmarks* 196, 209 (1967), *quoted in United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *United States v. Nofziger*, 878 F.2d at 452. Such a rule of lenity is to be used only when there is uncertainty about the statute's meaning, it is "not an inexorable command to override common sense and evident statutory purpose." *United States v. Moore*, 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975). Thus, to the extent that any ambiguity remains regarding the meaning of the term "crime of violence," the rule of lenity requires resolution of the ambiguity in favor of the accused. Consequently, because none of the offenses charged, by their nature, involves serious risk of injury, defendant must be found not to have committed a crime of violence.

**B.**

■ Defendant also meets Guideline 5K2.13's criterion of possessing diminished mental capacity. Dr. Pickar's testimony confirms that defendant committed the offenses to which he pled guilty while suffering from significantly reduced mental capacity, specifically, that caused by schizophreniform disorder. Transcript at 13 (Oct. 23, 1989). At the time of the crime, defendant's mental illness was untreated and, in Dr. Pickar's words, he was "decompensating" from a state of remission. *Id.* at 25–26. Dr. Pickar's testimony also confirmed that defendant's mental illness did not result from his addiction to drugs. *Id.*

at 11–12. As pointed out by Dr. Pickar, defendant's illness existed independently of, and predated, his addiction to narcotics. *Id.* at 11–12, 14–15, 50. Accordingly, it must be concluded that defendant committed the crimes to which he pled guilty while suffering from a schizophreniform disorder. Furthermore, as previously stated, Dr. Pickar testified that defendant's mental condition and his reaction to psychotropic medication contributed to his drug use and aggravated it, and that his drug use contributed to and aggravated his mental condition. Transcript at 13–14, 18–19, 26 (Oct. 23, 1989).

The government argues that 5K2.13 cannot properly be applied to defendant because it contends that, despite defendant's history of mental illness, he would not have trafficked in drugs if he had not voluntarily involved himself in cocaine. Because his addiction to cocaine and his mental illness were interrelated causes of his trafficking in drugs, the government contends, no factual predicate for departure exists. The government's argument, however, is defeated by the plain language of the relevant Guideline.

■ Guideline 5K2.13 calls for reduction of defendant's sentence to "the extent to which reduced mental capacity contributed to the commission of the offense." It does not require that the reduced mental capacity be demonstrated to be the sole, or "but for," cause of the commission of the offense. Indeed, introduction of such a concept would run contrary to the settled proposition of law that an event may result from the confluence of many factors operating at the same time and that, in such a case, each may be a proximate cause. *See, e.g., Murphy v. United States,* 653 F.2d 637, 648 n. 48 (D.C.Cir.1981); *Hecht v. Pro-Football, Inc.,* 570 F.2d 982 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). Consequently, that

defendant's mental illness and drug addiction may both have contributed to the commission of the offense does not bar application of 5K2.13 to reduce defendant's sentence to the extent that defendant's mental illness contributed to the commission of the offenses.[3]

### C.

■ The government also argues that defendant's two prior narcotics offenses demonstrate the need for defendant's incarceration to protect the public and, therefore, that 5K2.13 is inapplicable to defendant. However, it is clear that defendant's untreated mental illness, for which he is now receiving appropriate treatment, was in large part responsible for these offenses. It should also be noted that, whatever sentence is imposed on defendant in the instant cases, defendant will be forty-three by the time of his release from prison in North Carolina. In addition, under the statutory mandatory minimum for defendant's offense of possession with intent to distribute, when defendant reaches the age of 48, he will not only have served ten years of imprisonment but he will also have been subject to five years of supervised release, both of which should provide him with medication and other treatment for his mental illness. 21 U.S.C. § 841(a), (b). Taking these circumstances into consideration, it cannot be said that the full period of incarceration required by unmitigated application of the Guidelines is necessary to protect the public. Whether or not the sentence imposed departs from the Guidelines, the public will be adequately protected at least until defendant is 48 years old. The risk which he would pose to the public after that age is doubtful. In fact, the public would more likely be more burdened by the responsibility of caring for defendant in prison at great expense as he passed from middle age (48) to old age (77)

---

**3.** If it were necessary to reach the issue of whether defendant's drug use was voluntary, there is record evidence in the chronology of the developments in defendant's life and from Dr. Pickar's testimony from which a trier of fact could reasonably infer and find that defendant's drug use was not voluntary, but was rather an

addiction produced by his mental illness, inability to tolerate the psychotropic medication prescribed for him, and resulting withdrawal from prescribed medication and professional treatment. *See, e.g.,* Transcript at 46–51 (Oct. 23, 1989).

while serving a full 25–year sentence subsequent to his 10–year North Carolina sentence which unmitigated application of the Guidelines would authorize.

### D.

■ Defendant is therefore eligible for departure from the Guidelines on account of his diminished capacity. The Guidelines provide for such a departure to "the extent to which reduced mental capacity contributed to the commission of the offense." § 5K2.13. Dr. Pickar testified that defendant's commission of the offenses was caused, to the best of his expert knowledge, approximately 50% by his mental illness and 50% by his addiction to drugs. Transcript at 56 (Oct. 23, 1989). Mechanistic application of Dr. Pickar's conclusion to Guideline 5K2.13 would therefore reduce the applicable Guideline range for defendant's Count II offense to between 94 and 117½ months. Such a sentence, however, would impermissibly place defendant below the 120–month statutory minimum established by 21 U.S.C. § 841(a), (b). On the other hand, application of the mandatory minimum of 120 months, would produce an appropriate sentence, as confirmed by testing that sentence by the factors set out in 18 U.S.C. § 3553(a): [4]

(1) As stated, the nature and circumstances of the offense are in tension with the characteristics of the defendant.

(2) Incarceration of a 33–year old cocaine addict with schizophreniform for ten years

without parole plus five years of supervised release will, in my judgment,

(A) reflect the seriousness of defendant's offense, promote respect for law, and provide a just punishment for the offense;

(B) afford adequate deterrence to criminal conduct in that fully competent offenders will know that they would face the much harsher penalties required for them by the Guidelines, while other mentally impaired addicts who would traffic in drugs will not likely be deterred by knowing of this or any other sentence, no matter what its length;

(C) protect the public from further crimes—for ten years by incarceration and for another five years of close supervision on parole, during which time he should receive professional treatment for his illness with a view toward attaining a drug free and crime free life for his remaining years after 48; and

(D) provide, by the order at sentencing, appropriate medical care and vocational training for defendant while he is incarcerated and during the five-year period of supervised release.

(3, 4, and 5) I have carefully considered the more severe sentences available and the Sentencing Commission policy statements and Guidelines.

(6) No showing has been made that the sentence imposed would create unwarranted sentence disparities with other drug addicts with schizophreniform disorder who are convicted of similar crimes.

---

**4.** 18 U.S.C. § 3553 states that "[t]he court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines that are issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(1) and that are in effect on the date the defendant is sentenced;

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## IV.

■ Defendant also argues that departure from the penalty established by the Guidelines is warranted under Guideline 5K2.0. This Guideline states that "the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" Defendant argues that the Commission did not consider the type and kind of reduced mental capacity under which defendant has been functioning since 1979, nor the combination of his mental condition, use of psychotropic drugs, and drug addiction; he argues that departure from the Guideline range is appropriate pursuant to 5K2.0 on these bases.

The government opposes departure on the basis of this provision. It points out that the Guidelines state that mental and emotional conditions and drug addiction are not ordinarily to be considered relevant in determining whether to depart. §§ 5H1.3, 5H1.4. Insofar as mental capacity should be taken into account, the government argues, it is only through the application of Guideline 5K2.13, which is specifically designed to deal with the issue of mental capacity. According to the government, "To say that the defendant is entitled to a departure under an amalgam of sections, because he does not truly qualify for a departure under either section misperceives and misapplies the guidelines." Government's Supplemental Memorandum at 4 (Nov. 29, 1989).

There may be cases in which an unusual combination of circumstances would warrant departure from the Guidelines pursuant to 5K2.0, even though the individual circumstances would not warrant such departure. Indeed, I was originally inclined to apply 5K2.0 in this case. However, as pointed out in the government's well-reasoned brief, Guideline 5K2.13 adequately covers the combination of circumstances at issue in this case and demonstrates that the Sentencing Commission considered the interaction between a defendant's mental condition and his or her use of drugs. On reflection, I am satisfied that Guideline 5K2.13 rather than 5K2.0 should solely govern the determination of whether departures should be made on the basis of this combination of factors.

## V.

■ Defendant argues that his circumstances not only warrant a departure from the range established by the Guidelines, but also the imposition of a concurrent rather than consecutive sentence to the one he is currently serving in North Carolina. Section 5G1.3, as amended effective November 1, 1989, states: "If the instant offense was committed while the defendant was serving a term of imprisonment ..., the sentence for the instant offense shall be imposed to run consecutively to the unexpired term of imprisonment." The government agrees that, because this version of the Guideline was effective on the date of defendant's sentencing, it applies in this case, even though an earlier version was effective at the time the offenses were committed.[5] *See* 18 U.S.C. § 3553(a)(4). As amended, the Guideline grants judges the discretion to determine whether a sentence will be served concurrently or consecutively in a situation such as this, where defendant was not serving a prison term at the time he committed the offenses. The considerations which warrant departure on the basis of 5K2.13 and

---

**5.** The unamended version of Guideline 5G1.3 stated that where, at sentencing, a defendant is already serving one or more unexpired sentences, the new sentence must be served consecutively to the one being served. Under this unamended Guideline, unless defendant's case met a limited number of exceptions, he would have had to serve this sentence consecutively to the ten-year sentence that defendant is serving in North Carolina. As both the defendant and the government agree to the application of the amended version of the Guidelines in this case, that version is applied. The issue of whether the amended version of the Guidelines could be applied to an offense committed before the version became effective but for which defendant is sentenced afterwards where such a version would disadvantage a defendant is not reached in this case.

which, on the basis of the factors set out in 18 U.S.C. § 3553(a), establish the appropriateness of a 120–month term of imprisonment, also warrant imposition of a concurrent rather than consecutive sentence to the one defendant is serving in North Carolina.

### VI.

In sum, the unique circumstances of defendant's situation warrant substantial departure from the raw Guideline range. On the basis of the foregoing, as announced in open court on December 1, 1989, in Case No. 88–0245–01, defendant has been sentenced to serve 120 months on Count 2 for the charge of possession with intent to distribute cocaine base and 60 months on Count 5 for the charge of possession of a weapon by a felon. These sentences will be served concurrently with each other, and with the North Carolina sentence that defendant is now serving. Following his prison term, defendant is subject to 5 years of supervised release on Count 2 and 3 years of supervised release on Count 5. These periods of supervised release are to run concurrently with each other. In addition, in Case No. 89–152, defendant has been sentenced to serve 3 months on the count of failure to appear. That sentence will be served consecutively with the sentences imposed in No. 88–0245. Following service of this prison term, defendant is subject to 3 years of supervised release on this count, a period that is to run concurrently to the aforementioned supervised release periods.

The conditions of supervised release will be as follows:

1. that defendant abide by the standard conditions of supervised release recommended by the United States Sentencing Commission;

2. that defendant not possess a firearm or other dangerous weapon;

3. that defendant not commit any crimes, federal, state, or local; and

4. that defendant participate in mental treatment and drug abuse treatment as directed by the United States Probation Office which may include urine testing to determine whether or not he has reverted to illicit drug usage.