**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carolyn Kay POFF,
Defendant–Appellant.**

No. 89–3017.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 27, 1990.

Decided Feb. 14, 1991.

Andrew B. Baker, Jr., Asst. U.S. Atty., Hammond, Ind., Thomas O. Plouff, Asst. U.S. Atty., Office of the U.S. Atty., South Bend, Ind., for plaintiff-appellee.

David B. Weisman, Weisman & Associates, South Bend, Ind., for defendant-appellant.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, and KANNE, Circuit Judges.

FLAUM, Circuit Judge, with whom BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., RIPPLE, and KANNE, Circuit Judges, join.

Can a "crime of violence" also be a "non-violent offense"? We heard this case en banc to answer this seemingly straightforward question. The career offender provision of the Sentencing Guidelines defines a "crime of violence" as, *inter alia*, any offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(1)(i); *see also* 18 U.S.C. § 16 (progenitor of the Guideline definition). The Guidelines also authorize judges to depart downward from an otherwise applicable sentencing range if a defendant committed "a non-violent offense while suffering from significantly reduced mental capacity," U.S.S.G. § 5K2.13, but don't define "non-violent offense." We must determine whether that term can encompass a "crime of violence" as defined in § 4B1.2.

These two provisions are at issue because the appellant has a history of both

mental illness and making threats. She is a forty-four year-old woman convicted for writing six threatening letters to President Reagan in 1988. *See* 18 U.S.C. § 871. Her father, now deceased, sexually abused her until she was twenty, and she has since been in and out of psychiatric institutions as an adult. Among the manifestations of her mental illness is her penchant for threatening public officials at, she believes, the behest of her dead father. Before she began writing to President Reagan, she had been convicted of making two bomb threats, of threatening a county prosecutor, and of arson for setting a hotel room on fire. Her probation was revoked in 1979, after she wrote five threatening letters to President Carter.

Appellant admitted that she threatened President Reagan, but raised an insanity defense at trial. A jury convicted her, and her prior convictions required the trial judge to apply the career offender provision of the Guidelines to her sentence, producing a fifty-one month sentence. *See* § 4B1.1; *United States v. McCaleb*, 908 F.2d 176, 178 (7th Cir.1990) (a threat is a crime of violence to which § 4B1.1 applies); *United States v. Left Hand Bull*, 901 F.2d 647, 649 (8th Cir.1990) (same). Appellant submits that the provision did not apply to her since all concede that she never intended to carry out her threats, but the Guidelines do not condition application of the enhancement on whether the defendant intended to make good on the threat. Threats are themselves a form of violence that "may be costly and dangerous to society in a variety of ways, even when their authors have no intention whatever of carrying them out." *Rogers v. United States*, 422 U.S. 35, 46–47, 95 S.Ct. 2091, 2098–99, 45 L.Ed.2d 1 (1975) (Marshall, J., concurring); *cf. United States v. White*, 903 F.2d 457, 467 (7th Cir.1990) (including threats as a type of violent conduct); *French v. Owens*, 777 F.2d 1250, 1257 (7th Cir.1985) (describing threats as a lesser form of violence). For that reason, 18 U.S.C. § 871 criminalizes the utterance of a threat, not the intent to carry it out. *United States v. Hoffman*, 806 F.2d 703, 706–07 (7th Cir.1986); *see also Left Hand Bull*,

901 F.2d at 649 (defendant's inability to carry out threat is irrelevant). Both Congress (*see* 18 U.S.C. § 16) and the Sentencing Commission have deemed it appropriate to incapacitate for a longer period recidivists who have demonstrated a violent nature in the past by threatening others, whether or not they carried out their threats or intended to do so. When a defendant did manifest an intent to carry out the threat, the Guidelines require courts to *increase* the sentence from the base offense level. *See* § 2A6.1(b) (increase base offense level by six in such cases). And, when the threatened victim is the President, the Guidelines call for longer sentences still. *See* Application Note 2 to § 3A1.2; *McCaleb*, 908 F.2d at 177. The district court did not apply § 3A1.2 to appellant's sentence, but should have since the adjustment factor of § 3A1.2 is mandatory.

The Commission also concluded, however, that in some cases it may be appropriate to reduce the sentences of defendants who have "committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants...." U.S.S.G. § 5K2.13 (policy statement). The Guidelines permit, but do not require, sentencing judges to depart downward from the otherwise applicable sentencing range in such cases. Appellant asked the district court to depart on this basis. Judge Miller, in a thoughtful sentencing memorandum, 723 F.Supp. 79 (N.D.Ind.1989), concluded that § 5K2.13 does not authorize departure in cases, like this one, where a defendant was convicted of a "crime of violence" as defined by § 4B1.2 of the Guidelines.

The government claims that we have no jurisdiction to review a refusal to depart from the Guidelines. That is true when the refusal reflects an exercise of the judge's discretion. *United States v. Ojo*, 916 F.2d 388, 394 (7th Cir.1990); *United States v. Franco*, 909 F.2d 1042, 1045 (7th Cir.1990). Judge Miller, however, declined to depart because he believed the Guidelines did not permit him to do so in this case. *See* 723 F.Supp. at 84–85. That was

a legal conclusion, not an exercise of discretion. 18 U.S.C. § 3742(a)(1) authorizes appeal whenever a sentence is "imposed in violation of law," a source of jurisdiction that permits appellate review of legal interpretations of the Guidelines. We therefore agree with *United States v. Bayerle,* 898 F.2d 28, 31 (4th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 65, 112 L.Ed.2d 39 (1990), that a decision not to depart is reviewable on appeal if it is the product of a conclusion that the judge lacks authority to depart. *See also United States v. Prescott,* 920 F.2d 139 (2d Cir.1990); *United States v. Chotas,* 913 F.2d 897, 899 (11th Cir.1990); *United States v. Cheape,* 889 F.2d 477, 480–81 (3d Cir.1989); *United States v. Russell,* 870 F.2d 18, 20–21 (1st Cir.1989). The government cites *United States v. Franz,* 886 F.2d 973 (7th Cir. 1989), to support its position, but that case involved a discretionary refusal to depart. Moreover, *Franz* acknowledged that 18 U.S.C. § 3742(a)(1) authorizes appellate review of a refusal to depart that is based on an erroneous legal conclusion about the court's authority to depart. *Id.* at 981.

■ Although we have jurisdiction to consider this appeal of the district court's decision not to depart, we agree with the court's conclusion that it lacked authority under § 5K2.13 to do so. (Appellant does not allege that the district court had authority to depart because a mere policy statement like § 5K2.13 does not exhaust the possible grounds for departure, a claim we adverted to in *United States v. Bayles,* 923 F.2d 70, 71–72 (7th Cir.1991). We did not address the claim in *Bayles,* and will not do so here since it has not been raised.) Appellant's claim with respect to § 5K2.13 is the same one she raised as to § 4B1.2: she claims that threatening President Reagan was a "non-violent offense" since she didn't carry through on her threats. We disagree, for the same reasons we have already expressed. Threats are themselves a form of violence, and § 4B1.2 defines her crime as one "of violence." Section 4B1 is a career offender provision, but contrary to the dissent's suggestion, the Guidelines do not define a threat as a "crime of violence" only when uttered by a career offender.

Rather, they define "career offenders" as those who have a history of committing crimes of violence, among these, making threats. The incongruity of appellant's position is not a product of her status as a career offender; her argument would be just as untenable were she a first offender. We decline to adopt an argument that rests on the premise that the Guidelines define the same act as both a "crime of violence" and a "non-violent offense."

■ Appellant observes, however, that the Commission did not define "non-violent offense" in § 5K2.13. That, she submits, is an omission suggesting that the Commission meant different things by "violent offense" and "crime of violence." Courts often say that the choice of different words reflects an intent to say something different. *See, e.g., Zabielski v. Montgomery Ward & Co.,* 919 F.2d 1276, 1279 (7th Cir. 1990). But here the Commission used the same word—"violence." True, in one case it used a negative construction—"non-violent"—and in the other case used a prepositional phrase containing the noun "violence" as a modifier rather than using the simpler adjective "violent"—but the root, and meaning, are the same in both cases. (One might ascribe significance to the use of "offense" in § 5K2.13 and "crime" in § 4B1.2, but that would not help appellant since "offense" encompasses a broader spectrum of illegality than does "crime.") "[A] rather heavy load rests on him who would give different meanings to the same word or the same phrase when used a plurality of times in the same Act...." *United States v. Montgomery Ward & Co.,* 150 F.2d 369, 377 (7th Cir.1945). Appellant cannot meet that burden by asking us to tease meaning from the Commission's use of a prepositional phrase rather than an adjective. The Guidelines should be read as a whole, § 1B1.1(i), and when the same word appears in different, though related sections, that word likely bears the same meaning in both instances. *Id.; Prussner v. United States,* 896 F.2d 218, 228 (7th Cir.1990) (en banc); *see also Reiche v. Smythe,* 80 U.S. (13 Wall.) 162, 165, 20 L.Ed. 566 (1871) ("Both acts are *in*

*pari materia,* and it will be presumed that if the same word be used in both, and a special meaning were given it in the first act, that it was intended it should receive the same interpretation in the latter act....").

The Armed Career Offender provision of 18 U.S.C. § 924 provides further evidence that the linguistic variation between these Guideline provisions carries no import. There Congress defined the term "violent felony" to include any crime that "has as an element the use, attempted use, or threatened use of physical force against the person of another," 18 U.S.C. § 924(e)(2)(B)(i), a definition that mirrors that of "crime of violence" in 18 U.S.C. § 16 and in § 4B1.2 of the Guidelines. If it is difficult to discern a difference between "violent offense" and "crime of violence," it is well nigh impossible to divine any distinction between a "violent felony" and a "violent offense."

We think it likely that had the Commission desired to distinguish among types of violence, it would have expanded its vocabulary. At a minimum, it would have offered a technical definition for each term. Perhaps a cross-reference between the two sections would have eliminated any possibility of confusion, but hindsight is a demanding critic. It is hardly surprising that the Commission failed to foresee the argument that a crime of violence can, under the same sentencing scheme, also be a non-violent offense. The natural reading of these terms suggests that they are contrapositives; the omission of a separate definition, or a cross-reference, is only surprising if the Commission intended the terms to overlap. Every court that has considered the interplay between § 4B1.2 and § 5K2.13 has held that the terms are mutually exclusive, most finding the proposition so obvious that little or no discussion was required. *See United States v. Russell,* 917 F.2d 512, 517 (11th Cir.1990); *United States v. Rosen,* 896 F.2d 789, 791 (3d Cir.1990); *United States v. Borrayo,* 898 F.2d 91, 94 (9th Cir.1989); *United States v. Maddalena,* 893 F.2d 815, 819 (6th Cir. 1989); *United States v. Speight,* 726 F.Supp. 861, 865–66 (D.D.C.1989).

Our reading does not rely solely on the common root of the terms in question. The Commission chose to define threats as crimes of violence in the Career Offender provision of the Guidelines, a fact that underscores the serious nature of such crimes. The Guidelines reflect the view that those who have a history of crimes of violence merit increased incarceration, and include those, like appellant, who have threatened violence in that category of defendants. In addition to limiting the authority of courts to decrease the sentences of defendants with reduced mental capacity to cases in which the defendant committed a non-violent offense, § 5K2.13 further circumscribed the authority of courts to depart on this basis by adding the proviso that "the defendant's criminal history does not indicate a need for incarceration to protect the public." Career offenders, by definition, fail to meet this condition. *See* 28 U.S.C. § 994(h) (mandating term of imprisonment "at or near the maximum term authorized" for defendants who have been convicted of two prior "crimes of violence"); *cf. Taylor v. United States,* —— U.S. ——, 110 S.Ct. 2143, 2152, 109 L.Ed.2d 607 (1990) ("career offenders" sentenced under 18 U.S.C. § 924(e) are those who present a potential threat of harm to persons). So even if the terms "non-violent offense" and "crime of violence" were not mutually exclusive, § 5K2.13 would not have authorized the district court to depart; under the Guidelines, appellant is one whose criminal history indicates a need for incarceration to protect the public. Her reading supposes that in § 4B1.2 the Commission concluded that she required *additional* incarceration because of her criminal history (making threats) and in § 5K2.13 that she warranted *less* incarceration because of the same history (*merely* making threats). We cannot credit a reading that produces such an illogical and inconsistent interpretation of the Guidelines.

Even if we believed that the Commission intended to define violence differently in § 5K2.13, we could do little but guess as to its meaning. Appellant asks us to expand the realm of cases in which courts may

depart by speculating that the Commission intended the category of "violent offenses" to be more narrow than the category of "crimes of violence" established in § 4B1.2. Section 5K2.13 doesn't define a violent, or non-violent, offense, however, and appellant points to no evidence suggesting that the Commission intended "violent offense" to be a more restrictive term. One can just as easily posit that the Commission intended a broader definition, one encompassing violence against property as well as violence against persons; "violence" is not a word naturally cabined to acts against persons. Because those suffering mental incapacities are effectively less deterrable (making the need for incapacitation greater), it would not be unreasonable to assume that the Commission believed departures to be warranted only when there is little prospect that such a defendant will manifest *any* form of violent behavior. That this reading would not subvert the purpose of § 4B1.1 is a point that further commends it.

All this is not to say that there is not an argument in favor of permitting downward departures for those with diminished mental capacity when the prospect that they will carry through with threats seems nil. When there is no need to incapacitate a person and where the deterrent and retributive effects of punishment are minimal, reduced sentences may be warranted. Certainly in this case, the utility of a fifty-one month sentence can be debated. By now, the Secret Service is well-acquainted with appellant, and her activities may impose little additional burden on the Service's resources. On the other hand, she did set a hotel room afire once, and we ought not ask, and probably do not want, Secret Service agents to play psychoanalyst in order to determine whether a threat to the President is genuine or merely a cry for attention. But this is a debate for Congress and the Sentencing Commission. Had they wished courts to consider the necessity of incapacitating defendants with reduced mental capacity who have committed violent crimes, they could have said so. Instead, they categorically limited authority to depart on the basis of mental incapacity to cases in which the defendant has committed only non-violent offenses; the need for incapacitation can be considered only within that limited set. The Commission has been silent in the face of the unanimous view of the courts that the terms are mutually exclusive, implying that it approves that reading. *In re Sinclair*, 870 F.2d at 1345. Regardless of our views about its merit, we cannot limit a categorical rule by giving terms less than their obvious meaning, *id.* at 1343–44, even where, as here, the result has harsh consequences. The sentence is therefore AFFIRMED.

EASTERBROOK, Circuit Judge, with whom CUDAHY, POSNER, COFFEY, and MANION, Circuit Judges, join, dissenting.

Carolyn Kay Poff is mentally disturbed, in part as a result of extended sexual abuse by her father. One manifestation of this disturbance is that at her (deceased) father's command, Poff sends threatening letters to public officials. Poff has received increasingly stiff sentences for these threats, although no one believes that she is dangerous. She is a pest, a gnat buzzing in the ear of the Secret Service. My colleagues hold that the district judge nonetheless is *forbidden* in passing sentence to consider the mental condition that impels Poff to send these letters. Although a textual argument supports this conclusion, we should not attribute this heartlessness to the Sentencing Commission unless we must—and we needn't.

Poff asked the district judge to reduce her sentence on the authority of U.S.S.G. 5K2.13 (policy statement), which provides:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

Threatening public officials is a "crime of violence" for purposes of the career offender guideline, U.S.S.G. 4B1.1. Is the "non-violent offense" to which § 5K2.13 refers the contrapositive of "a crime of violence"? If "non-violent offense" and "crime of violence" are exclusive, then § 5K2.13 does not authorize a reduction.

Guideline 4B1.2 defines the term "crime of violence". Policy statement 5K2.13 uses the term "non-violent offense", which it does not define. Statement 5K2.13 is not accompanied by notes. The majority concludes that a "crime of violence" cannot be a "non-violent offense". It is jarring to select a high sentence level on the ground that a crime is one "of violence" only to turn around and depart on the ground that the defendant committed a "non-violent offense". Silence on the Commission's part is insufficient, my colleagues believe, to require such a contradiction, and the majority's thoughtful opinion makes a strong argument for that position.

Yet it is an accident that our case involves a repeat offender. If the majority is right, § 5K2.13 is unavailable for a first offense as well as a third, although there is then no incongruity. Does § 4B1.2 make § 5K2.13 unavailable for *all* criminal threats (and a raft of other offenses, indeed for the bulk of offenses)? It would have been easy to write § 5K2.13 to say that the judge may depart unless the defendant committed a "crime of violence" as § 4B1.2 defines it; instead the Commission selected different formulations. Although it laid out a detailed meaning for "crime of violence" in § 4B1.2, it did not provide so much as a cross-reference in § 5K2.13, a curious omission if the Commission meant to link these phrases so tightly that they are mutually exclusive.

Courts often say that different language in different places conveys different meanings. *Pittston Coal Group v. Sebben*, 488 U.S. 105, 115, 109 S.Ct. 414, 421, 102 L.Ed.2d 408 (1988); *United States v. Gaggi*, 811 F.2d 47, 56 (2d Cir.1987); *Tafoya v. Department of Justice*, 748 F.2d 1389, 1391–92 (10th Cir.1984), quoting from *Lankford v. LEAA*, 620 F.2d 35, 36 (4th Cir.1980) (Haynsworth, J.); *Seeber v. Washington*, 96 Wash.2d 135, 634 P.2d 303, 306 (1981). Most of the time this approach overstates the precision with which a legislature chooses its words; drafters may not know that a similar phrase exists elsewhere, and if they know they may believe that the two are equivalent. The guidelines and their associated commentary were written as a unit, however, and with greater than customary attention to the relation among sections. *United States v. Pinto*, 875 F.2d 143, 144 (7th Cir.1989). Amendments numbering 359 over three years attest to a continuous effort to make the text and notes an integrated whole. When it makes sense to attribute different meanings to different phrases in such a detailed package, a court should do so. *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972); cf. *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985).

"Crime of violence" and "non-violent offense" have a root word in common but readily may take meanings other than as opposites. As the Commission was at pains to establish in § 4B1.2, whether a crime is one "of violence" depends on its elements and not on the defendant's conduct, so that an unrealized prospect of violence makes the crime one of violence. Cf. *Taylor v. United States*, —— U.S. ——, 110 S.Ct. 2143, 2159–60, 109 L.Ed.2d 607 (1990). This is an abnormal sense, a term of art. It took a detailed definition to make it so. Then comes § 5K2.13, in which "non-violent offense" appears without elaboration or cross-reference. Best to read these words in their ordinary sense rather than as tied to the term of art in § 4B1.2. A "non-violent offense" in ordinary legal (and lay) understanding is one in which mayhem did not occur. The prospect of violence (the "heartland" of the offense, in the guidelines' argot) sets the presumptive range; when things turn out better than they might, departure is permissible.

Consider why "significantly reduced mental capacity" ever should be a ground for lenience. It is not that persons suffering from conditions short of legal insanity

are not dangerous; they may be very dangerous and, because of the mental condition, effectively undeterrable. A hefty sentence may be appropriate simply because it incapacitates and so reduces the likelihood of further offenses. When the disturbed person's conduct is non-violent, however, incapacitation is less important. Section 5K2.13 read as a whole, including the final reference to the "need for incarceration to protect the public", says that when incapacitation is not an important justification for punishment, mental condition may be the basis of a departure. Persons who voluntarily use drugs, and whose capacity is "diminished" by their own choice, also are dangerous, and legal threats may induce them to abandon their habits; § 5K2.13 therefore excludes them expressly. *United States v. Fonner*, 920 F.2d 1330, 1334–35 (7th Cir.1990), in which the threat was accompanied by a history of (real) violence, illustrates a circumstance under which the "need for incarceration to protect the public" bars a departure under § 5K2.13. Poff's circumstances differ, and the Commission has not required judges to treat the innocuous threatener and the murderous one identically.

The criminal justice system long has meted out lower sentences to persons who, although not technically insane, are not in full command of their actions. The Sentencing Commission based its guidelines on the common practices of judges, which it attempted to make more uniform without fundamentally altering the criteria influencing sentences. Under both the desert approach to sentencing and the deterrence approach, mental states short of insanity are important. Persons who find it difficult to control their conduct do not—considerations of dangerousness to one side—deserve as much punishment as those who act maliciously or for gain. Poff is a victim of her father's abuse, and an expert witness concluded that it continues to influence her acts. Determining the cause of mental conditions is more a black art than a science; a district judge need not accept such testimony. But if the judge credits it, then Poff's mental state is a lingering consequence of criminal acts committed against her. It is a shame when her father's crimes continue to take their toll by leading to acts that in turn yield long incarceration. Some punishment is essential; the district judge found that Poff can be influenced by legal sanctions and is intellectually (although not always emotionally) capable of conforming to the law's demands. But 51 months in prison without possibility of parole is a harsh sentence for someone known to be all bark and no bite, and whose letters therefore do not siphon resources from the investigation of those posing genuine danger. Because legal sanctions are less effective with persons suffering from mental abnormalities, a system of punishment based on deterrence also curtails its sanction. See Gary S. Becker, *Crime and Punishment: An Economic Approach*, 76 J.Pol.Econ. 169 (1968), reprinted in his *The Economic Approach to Human Behavior* 39, 59–60 (1976). Scarce resources and prison space achieve greater deterrence when deployed against those who are most responsive to the legal system's threats and who pose the greatest danger if not deterred.

On either a deterrent or a desert rationale, then, appropriate punishment for a person such as Poff is not as heavy as that for someone who threatens the President with intent to carry through. Ironically, we may be sure that Poff is harmless because of her 20–year history of empty threats, the very circumstance causing the guidelines to call her a career criminal. Under the court's reading of § 5K2.13 Poff must be treated the same as a terrorist whose plan was thwarted only by chance. I am reluctant to impute that conclusion to the Sentencing Commission when it did not say that "crime of violence" and "non-violent offense" are mutually exclusive. The reasons behind § 5K2.13 combine with the presumption that different terms in a carefully drafted code such as the guidelines connote different things to lead me to conclude that "non-violent offense" refers to crimes that in the event did not entail violence. When prison is not justified by the need to incapacitate the defendant, § 5K2.13 is available.

Some of the district judge's discussion suggests that he would not have departed even if § 5K2.13 were available. Yet he gave Poff the minimum sentence of her guideline range, and it is not out of the question that he would have shaved the sentence further had he believed that § 5K2.13 allowed it. Whether to use the power under § 5K2.13 is the judge's decision. We ought to say that he possesses the discretion to decide.