UNITED STATES of America,
Plaintiff–Appellee,

v.

Donald SAUERWEIN, Defendant–
Appellant.

No. 92–3372.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1993.

Decided Sept. 22, 1993.

Richard H. Lloyd, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Div., Fairview Heights, IL (argued), for U.S.

James C. Delworth, Office of the Federal Public Defender, St. Louis, MO, Renee E. Schooley, Federal Public Defender, Andrea L. Smith (argued), Office of the Federal Public Defender, East St. Louis, IL, for Donald W. Sauerwein.

---

Before BAUER, Chief Judge, ROVNER, Circuit Judge, and TIMBERS, Senior Circuit Judge.*

ROVNER, Circuit Judge.

After pleading guilty to threatening the President of the United States in violation of 18 U.S.C. § 871, Donald Sauerwein was sentenced to twenty-seven months in prison and three years of supervised release. He appeals that sentence, arguing that the district court should not have increased his offense level by six points pursuant to Guidelines section 2A6.1(b)(1) for "engag[ing] in any conduct evidencing an intent to carry out such threat." We affirm.

### I.

During the summer of 1991, a confidential informant acquainted with Sauerwein told Bethalto, Illinois Police Officer Mike Griffin that Sauerwein had spoken about "wanting to set up an organization for the purpose of taking Government installations and Government agencies." The informant maintained contact with Sauerwein at Griffin's request and, in February 1992, reported that Sauerwein had recruited members, placed magazine advertisements, and clarified his organization's purpose to be the overthrow of the federal government by assassination of the President and Vice President of the United States. Griffin then decided to meet with Sauerwein and did so on February 25, 1992, posing as a prospective club member and wearing a hidden tape recorder. Following that initial meeting, Griffin had approximately two dozen additional conversations with Sauerwein that were not recorded.

Griffin recounted those conversations at Sauerwein's sentencing hearing. He confirmed that Sauerwein was actively seeking to recruit members for his organization. Sauerwein had placed an advertisement in the "American Survival Guide" magazine that stated:

Looking for individuals or groups to join alliance with low profile pro-military

group. We need people trained in all areas of survival and military knowledge. (D. Ex. B). Sauerwein explained to Griffin that he had kept the ad vague because he did not want potential members to know the precise nature of his plans. A number of people had written in response to the ad, and Sauerwein had contacted some of them in return. Sauerwein was particularly interested in an individual named Hixon. He had Hixon's picture and "was trying to set up a meeting and encouraging Mr. Hixon to supply weapons or money for the purchase of weapons." Despite Sauerwein's efforts, his group had only three actual "members," all of whom were government informants.

Sauerwein felt a need to show potential recruits that he was serious, and to that end, "he called [Griffin] trying to get the members together to go out and fire bomb the police cars with Molotov cocktails and blow up the ... Prairieville Pipeline, that would show everyone he was serious and end up resulting in recruiting more members." Sauerwein also discussed this plan with the confidential informant, although to Griffin's knowledge, Sauerwein never actually obtained materials or took any other action in furtherance of the plan. Griffin attributed Sauerwein's failure to follow through on the bombing to his own and the confidential informant's efforts to discourage it.

Sauerwein also had developed a constitution and bylaws for the club. One of the bylaws provided that "anyone that would turn in information on the group would be hunted down and their families and they would be killed...." The members also were to communicate by code and were not to use their actual names.

In addition to building his organization, Sauerwein explored ways to obtain weapons. Griffin testified:

[H]e would talk to me about purchasing firearms, different calibers. He was actively trying to do that, trying to get his members to find someone that had guns he could purchase.... [H]e made contact with a person in Edwardsville that he

---

* The Honorable William H. Timbers of the United States Court of Appeals for the Second Circuit, sitting by designation.

asked, he was asking around trying to find out if anyone had any guns. He found someone that he said did have some, and he was making several attempts to purchase those.

As for killing the President:

[Sauerwein] had a detailed plan as far as the weapon that he wanted, he had seen in a magazine, and that was what he was going to try to get the money to purchase. He had detailed plans about how it was going to happen, number of men he needed, things he needed to do to create chaos before it would happen, like killing police officers and their families, he thought that would enstill [sic] fear and create chaos, and that was some of the beginning that he wanted to do.

According to Griffin, Sauerwein hoped that Hixon would supply money to pay for the weapons and had contacted someone named "Nate" in Edwardsville from whom he hoped to purchase M–16 and M–60 machine guns. Sauerwein wanted to recruit a shooter for the assassination because he himself had poor aim.

The transcript of Griffin's February 25, 1992 recorded meeting with Sauerwein corroborates Griffin's account:

[Sauerwein]: Uh, course there ... during election time, the one person that'd be assassinated would be President Bush.

[Griffin]: Now how we gonna do that? How's that gonna come about?

[Sauerwein]: Well, we need the best guy to uh, sniper him. I've got the rifle picked out, we just ... I got to get the other guy to buy it.

[Griffin]: What kind of rifle you talking about?

[Sauerwein]: It's a M–80, I think it's called M–89, it has 4.7 millimeter rounds, 50 caliber, has 2000 meter maximum range on it.

During his cross-examination of Griffin, Sauerwein's counsel highlighted some of the more fantastic aspects of the February 1992 conversation. For example, Sauerwein had told Griffin that he hoped to recruit as many as 100,000 members, that he considered breaking into or "taking over" the Granite City Army Depot or the Litchfield National Guard in order to obtain weapons, that he might abduct a Mexican drug lord who was worth $125 million or alternatively "hold a town hostage" and "drain the money out of the bank," and that the President's assassination would be accompanied by a nationwide offensive similar to the Tet Offensive in Vietnam. Sauerwein also told Griffin, "[n]ow our mission, the big one, uh, is the total takeover of the entire U.S., which means ... [e]liminate all congressman [sic], most of the police and their families, cause ..., they'll be our biggest threat."

Sauerwein was arrested on March 18, 1992, and on April 8, he was sent to the Federal Correctional Institution in Milan, Michigan for a psychological evaluation. The evaluation indicated that Sauerwein was competent to stand trial and that he had not been insane at the time of the offense. Sauerwein pled guilty to threatening the President on July 1, 1992, and was sentenced on September 18. The district court added six levels to the base offense level of 12 because Sauerwein had engaged in conduct evidencing an intent to carry out his threat (U.S.S.G. § 2A6.1). The court also gave Sauerwein a two-level reduction for acceptance of responsibility (U.S.S.G. 3E1.1). The adjusted offense level of 16, combined with criminal history category I, yielded a sentencing range of 21 to 27 months. The court sentenced Sauerwein to the maximum of 27 months.[1]

## II.

Guidelines section 2A6.1 establishes a base offense level of twelve for "threatening communications" and calls for a six-level increase "[i]f the defendant engaged in any conduct evidencing an intent to carry out such

---

1. The court did not apply Guidelines section 3A1.2, which provides for a three-level increase when the victim is a government official. Although we held in *United States v. Poff*, 926 F.2d 588, 590 (7th Cir.), *cert. denied*, — U.S. —,

112 S.Ct. 96, 116 L.Ed.2d 67 (1991), that such an adjustment is mandatory, we will not address this error, which the government did not raise either below or on appeal.

threat." The "Background" to that guideline explains that subsection (b), which outlines both the six-level increase and a four-level decrease for conduct "evidencing little or no deliberation," is meant to distinguish cases based on "the defendant's intent and the likelihood that the defendant would carry out the threat." U.S.S.G. § 2A6.1, Background. The district court must therefore consider not only whether the evidence indicates an intent to carry out the threat, but also whether it suggests that the defendant was likely to do so.

The district court's finding that Sauerwein's conduct evidenced an intent to carry out his threat is one of fact that we review only for clear error. *United States v. Hill*, 943 F.2d 873, 875 (8th Cir.1991); *United States v. Jimenez–Otero*, 898 F.2d 813, 814 (1st Cir.1990). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Instead, a finding of fact is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 573, 105 S.Ct. at 1511 (citations omitted); *see also United States v. Beal*, 960 F.2d 629, 632 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992).

The district court found that the evidence did suggest that Sauerwein intended to carry out his threat. The court explained:

I think that based on everything that I see in this record, the taped interview that we have referred to, the factual basis, the colloquy that I had with defendant both at the plea and as I recall another instance some colloquy with him other than the plea, I am also considering the reports and the examination and the term contained in the pre-sentence report. Based on those factors, I think there is sufficient evidence to conclude that there was an intent to carry out the threats.

(Tr. at 12.)

Sauerwein contends that he should not have received the six-level increase because,

although his conduct reflects an intent to form an organization, it does not suggest that he planned to act on his threats. Quoting his psychological evaluation, Sauerwein argues that his real purpose in forming the club was to satisfy his "need for power and authority over others to compensate for low self-esteem and a sense of inadequacy." (Sauerwein Brief at 4.) He contends that the implausibility of his plans—such as waging a nationwide Tet-like offensive, killing all police officers and their families (nationwide), and abducting a Mexican drug lord worth $125 million—suggests that he did not intend, or at the very least was unlikely, to follow through on his threats, and that his only objective was to impress others. Sauerwein also stresses that he had not set a time or place for the assassination and had not purchased a weapon.[2]

But contrary to Sauerwein's characterization, the evidence does reveal activity in furtherance of his threat against the President. Sauerwein had identified the type of guns he would use, had contacted people in an effort to locate such guns, and had formulated specific plans for getting money to pay for them. He also had recruited club members to assist in his plan. The fact that Sauerwein's words and deeds may have been meant to impress or to compensate for low self-esteem does not rule out the possibility that he would follow through on them; he might well have done so for those very reasons. Nor does the fact that many of his plans were unrealistic mean that he could not have acted on his threat against the President. The district court's finding that Sauerwein evidenced an intent to carry out his threat was not clearly erroneous.

### III.

The district court's finding that Sauerwein qualified for the enhancement was not clearly erroneous. Sauerwein's sentence is affirmed.

---

2. In fact, Sauerwein had indicated in his February 25, 1992 conversation with Griffin that the President would be assassinated "during election time."