

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-5-1997

# United States v. Askari

Precedential or Non-Precedential:

Docket 95-1662

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

## Recommended Citation

"United States v. Askari" (1997). *1997 Decisions*. Paper 55.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/55

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 95-1662
_____

UNITED STATES OF AMERICA

v.

MUHAMMAD ASKARI,
Appellant
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 92-cr-00288
_____

Submitted Under Third Circuit LAR 34.1(a)
November 6, 1996

Before: BECKER, McKEE and GARTH,
Circuit Judges.

(Filed March 5, 1997)

_____

OPINION OF THE COURT
_____

Per Curiam.

Muhammad Askari appeals the sentence imposed by the district court for his bank robbery conviction on the grounds that the court erred in refusing to grant a downward departure for diminished capacity under § 5K2.13 of the Sentencing Guidelines. Askari rests his argument on the facts that the unarmed bank robbery was non-violent and that he has a well-documented history of serious psychiatric illness.

Askari's mental illness at the time he committed the

bank robbery is not at issue. Indeed, prior to his sentencing, the district court found that Askari was not mentally competent, and committed him pursuant to 18 U.S.C. § 4244(d) to a federal institution for psychiatric care and treatment.[1] After the warden at the U.S. Medical Center for Federal Prisoners at Springfield, Missouri, certified that Askari had recovered and was again mentally competent, the court sentenced him to 210 months in prison, to be followed by three years supervised release.

The facts regarding the bank robbery are also not at issue. On April 23, 1992, Askari walked into the First Bank of Philadelphia at 1424 Walnut Street shortly after 2:00 p.m. He went to a closed teller's window and said two or three times, "Put the money on the counter." He then went to the window where bank teller Ellie Ishizaki was working and said, "You have three seconds to give me the money." Ishizaki gave him bait money. Askari then took the money and ran out the door. The tellers did

_____

1. Dr. Edward Guy examined Askari to assess whether he was competent to stand trial. Dr. Guy initially concluded that Askari was suffering from paranoid schizophrenia in partial remission, drug addiction, and seizure disorder. However, he still concluded that Askari was competent to stand trial. Following a second psychiatric evaluation before Askari's sentencing, Dr. Guy testified that Askari was not competent. Noting Askari's "history of serious mental illness," Dr. Guy found that Askari was too delusional to be able to cooperate with his attorney. The district court then ordered that Askari be committed. After two years of treatment at the U.S. Medical Center for Federal Prisoners at Springfield, Missouri, Askari was diagnosed as suffering from "Schizophrenia, Paranoid Type currently in remission with antipsychotic medication." The report noted that Askari initially "exhibited delusional thinking and auditory hallucinations" which improved with medication. The report concluded that Askari had been restored to competency.

not see Askari carrying any weapon, and Askari did not use any force or make any verbal threats to harm anyone. He did, however, have his hand underneath his shirt. Two bank employees together with a Center City Special District employee chased Askari. They caught him on the 1400 block of Locust Street. Police later found the bait money in Askari's pants. They did not recover a weapon.

At sentencing, defense counsel argued for a downward departure based on Askari's mental illness. The court refused to grant the departure. First, the court ruled:

I cannot depart downward for diminished capacity at the time of the offense based on the guidelines as I read them. They at least contain a policy statement that a downward departure for diminished capacity is limited to non violent offenses.

\* \* \*

-- you're doing it [requesting a downward departure] against the backdrop of a commission that says no downward departure for diminished capacity at the time of the offense, if the offense is a violent crime.

The court then went on to reject counsel's motion for a downward departure based on unusual mitigating circumstances not adequately considered by the guidelines. Finding that the guideline range was 210 to 240 months, the court imposed a sentence of 210 months in prison.

Askari's contention on appeal is that his unarmed bank robbery was a non-violent offense because he did not use any force or violence, verbally threaten anyone, or hurt anyone during the robbery. Askari, the argument continues, clearly

3

suffered from diminished mental capacity. He had a long history of serious psychiatric illness and was diagnosed as paranoid schizophrenic. In Askari's submission, the court should have ruled that it had authority to depart downward under U.S.S.G. § 5K2.13, which permits downward departures for diminished capacity if the defendant committed a "non-violent offense."

The district court, nevertheless, was quite correct in its holding. In United States v. Rosen, 896 F.2d 789, 791 (3d Cir. 1990), we held that the district court did not have the authority in a bank robbery sentence to depart downward because that offense is not a "non-violent offense." We so concluded by looking to a separate guidelines provision, § 4B1.2, which defines robbery as a "crime of violence." Although the circuits are split on this point, we are bound by our prior holding. Third Circuit Internal Operating Procedure 9.1.[2]

The judgment of the district court will be affirmed.

United States of America v. Muhammad Askari, No. 95-1662

---

2. Four other circuits have reached the same conclusion that this court reached in Rosen. United States v. Mazotte, 76 F.3d 887, 889 (8th Cir. 1996); United States v. Poff, 926 F.2d 588, 591-93 (7th Cir. 1991) (en banc) (6-5 decision); United States v. Maddaleny, 893 F.2d 815, 819 (6th Cir. 1989); United States v. Borrayo, 898 F.2d 91, 94 (9th Cir. 1989). However, two circuits, following Judge Easterbrook's dissent in Poff, have concluded that the "non-violent offense" requirement of § 5K2.13 is not governed by the "crime of violence" definition contained in § 4B1.2. United States v. Weddle, 30 F.3d 532, 540 (4th Cir. 1994); United States v. Chatman, 986 F.2d 1446, 1450 (D.C. Cir. 1993).

Becker, Circuit Judge, concurring.

Because of our decision in Rosen, and the constraints imposed on me by our internal operating procedures, I join the opinion and judgment of the court. I write separately because I believe that our decision in Rosen, that a downward departure is not available under §5K2.13 of the Sentencing Guidelines in relation to a crime, the commission of which involves no violence in fact, is incorrect and should be reconsidered by the Court en banc.

I.

A.

Our discussion of the issue in Rosen was brief:

Defendant contends that his crime was, in fact, non-violent because it did not involve physical force. Crimes of violence, however, include situations where force is threatened but not used. In other contexts, crimes of violence have been defined as offenses that have "as an element the use, attempted use, or threatened use of physical force. . . ." 18 U.S.C. § 16 (1988) (emphasis added); see U.S.S.G. § 4B1.2, comment. (N.1). Defendant would have us conclude that § 5K2.13's use of the term "non-violent" means something other than the opposite of a crime of violence.

We can find no support for such a contention and therefore find no error in the district court's determination that defendant's crime was not "non-violent." See United States v. Borrayo, 898 F.2d 91 (9th Cir. 1989); cf. United States v. Poff, 723 F.Supp. 79 (N.D. Ind. 1989). Consequently, guideline § 5K2.13 does not authorize a downward departure for this defendant's mental condition.

United States v. Rosen, 896 F.2d 789, 791 (3d Cir. 1990).

The linchpin of Rosen, which I believe the panel accepted uncritically, is the proposition that the definition of "crime of violence" contained in § 4B1.2, which is the career

5

offender provision, governs the meaning of "non-violent offense" in § 5K2.13. But the Rosen panel did not have the benefit of the arguments so incisively made by Judge Easterbrook, in his dissenting opinion in United States v. Poff, 926 F.2d 588, 593-96 (7th Cir. 1991) (en banc), which have subsequently been adopted by the D.C. and Fourth Circuits. See United States v. Weddle, 30 F.3d 532, 540 (4th Cir. 1994); United States v. Chatman, 986 F.2d 1446, 1450-52 (D.C. Cir. 1993). These three opinions have explained why the definition of "crime of violence" contained in the career offender provision does not govern the meaning of § 5K2.13, and have concluded that a sentencing court "must consider all the facts and circumstances of a case in deciding whether a crime is a 'non-violent offense.'" Chatman, 986 F.2d at 1453; see Poff, 926 F.2d at 594-96; Weddle, 30 F.3d at 540. I find these arguments, which I shall outline briefly, to be wholly persuasive. I also add some of my own.

B.

I perforce begin with a description of the applicable Guidelines provisions. Section 5K2.13 of the Guidelines provides:

If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

6

Section 5K2.13 does not define "violent" or "non-violent."  The only related definition contained in the guidelines is that found in the Career Offender Section, § 4B1.2:

(1) The term "crime of violence" means any offense under federal or state law punishable by imprisonment for a term exceeding one year that --

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

> (ii) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

The commentary to this section recites:

2. "Crime of violence" includes murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling.  Other offenses are included where (A) that offense has as an element the use, attempted use, or threatened use of physical force against the person of another, or (B) the conduct set forth (i.e., expressly charged) in the count of which the defendant was convicted involved use of explosives (including any explosive material or destructive device) or, by its nature, presented a serious potential risk of physical injury to another.  Under this section, the conduct of which the defendant was convicted is the focus of inquiry.

The term "crime of violence" does not include the offense of unlawful possession of a firearm by a felon.  Where the instant offense is the unlawful possession of a firearm by a felon, §2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition) provides an increase in offense level if the defendant has one or more prior felony convictions for a crime of violence or controlled substance offense; and, if the defendant is sentenced under the provisions of 18 U.S.C. § 924(e), §4B1.4 (Armed Career Criminal) will apply.

C.

The position adopted in Rosen may be seen in its best light through the lens of Judge Flaum, in his opinion for the six-five en banc Poff majority of the Seventh Circuit. Judge Flaum argues that, because the "Guidelines should be read as a whole"; because the root word employed in both provisions is the same; and because § 4B1.2 does not limit its definition of "crimes of violence" to situations involving a career offender, the definition of "crimes of violence" in § 4B1.2 must govern the meaning of "violent offense" in § 5K2.13. Poff, 926 F.2d at 591. To hold otherwise, he reasons, would result in an absurdity, for a crime could constitute both a "crime of violence" and a "non-violent offense."[3] Id.

---

[3]Judge Flaum rejects Poff's contention that the Commission's failure to define "non-violent offense" in § 5K2.13 suggests that "the Commission meant different things by `violent offense' and `crime of violence.'" He observes that:

[c]ourts often say that the choice of different words reflects an intent to say something different. See, e.g., Zabielski v. Montgomery Ward & Co., 919 F.2d 1276, 1279 (7th Cir. 1990). But here the Commission used the same word -- "violence." True, in one case it used a negative construction -- "non-violent" -- and in the other case used a prepositional phrase containing the noun "violence" as a modifier rather than using the simpler adjective "violent" -- but the root, and meaning, are the same in both cases. . . . "[A] rather heavy load rests on him who would give different meanings to the same word or the same phrase when used a plurality of times in the same Act . . . ." United States v. Montgomery Ward & Co., 150 F.2d 369, 377 (9th Cir. 1945). Appellant cannot meet that burden by asking us to tease meaning from the Commissions's use of a prepositional phrase rather than an adjective.

Poff, 926 F.2d at 591.

Judge Flaum finds further support for his position in the Armed Career Offender provision of 18 U.S.C. § 924, which defines "the term `violent felony' to include any crime that has as an element the use, attempted use, or threatened use of physical force against the person of another, 18 U.S.C. § 924(e)(2)(B)(i), a definition that mirrors that of 'crime of violence' in 18 U.S.C. § 16 and in § 4B1.2 of the Guidelines." Poff, 926 F.2d at 592. Because little discernible difference separates a "violent felony" and a "violent offense," Judge Flaum concludes that "had the Commission desired to distinguish among types of violence, it would have expanded its vocabulary. At a minimum, it would have offered a technical definition for each term." Id.

Judge Flaum draws additional strength for his interpretation from his perception of the Commission's policy choices:

The Guidelines reflect the view that those who have a history of crimes of violence merit increased incarceration, and include those, like appellant, who have threatened violence in that category of defendants. In addition to limiting the authority of courts to decrease the sentences of defendants with reduced mental capacity to cases in which the defendant committed a non-violent offense, § 5K2.13 further circumscribed the authority of courts to depart on this basis by adding the proviso that "the defendant's criminal history does not indicate a need for incarceration to protect the public." Career offenders, by definition, fail to meet this condition.

Id.

Under this view, even if a "crime of violence" and a "non-violent offense" were not mutually exclusive, § 5K2.13 would not authorize a downward departure for a career offender. If § 4B1.2

9

did not govern the meaning of a "non-violent offense," then a defendant could require additional incarceration because of his criminal history under § 4B1.2 and less incarceration because of the same history under § 5K2.13, an interpretation that Judge Flaum found to be so "illogical and inconsistent" that it could not be countenanced.  Id.

## II.

### A.

Much of Judge Flaum's opinion is couched in terms of linguistic analysis; however, I find such analysis ultimately unhelpful in resolving this difficult issue.  While "crimes of violence" and "non-violent offense" employ the same root word, the phrases "readily may take meanings other than as opposites."  Poff, 929 F.2d at 594 (Easterbrook, J., dissenting).  More importantly, the distinct objectives of the two provisions at issue – § 4B1.2 and § 5K2.13 – counsel that the meaning of the former not govern that of the latter.

When it employed the phrase "crime of violence" in § 4B1.2, the Sentencing Commission crafted a term of art intended to identify repeat offenders who deserve a longer sentence than others who have committed the same offense.  See 28 U.S.C. § 994(h).  Longer sentences for these "career offenders" are "justified by the purposes of incarceration, as set out in 18 U.S.C. § 3553(a)(2) (1988) and discussed in the Introductory Commentary to Part A of Chapter 4 of the Guidelines."  Chatman, 986 F.2d at 1451 (footnote omitted).  A repeat offender is more

10

culpable than a first time offender and, therefore, deserves greater punishment. Moreover, longer sentences "guarantee incapacitation of those repeat offenders whose past records suggest a propensity to commit violent crimes." Id. at 1451 (citing 128 Cong. Rec. 26,518 (1982) (statement of Sen. Kennedy)).

In an effort to address these policy concerns, the Commission drafted a definition of "crime of violence" that captures crimes involving "an unrealized prospect of violence." Poff, 929 F.2d at 594. Thus, § 4B1.2 penalizes a career offender for the elements of the crime for which he was charged and convicted and not for his actual conduct. Poff, 926 F.2d at 594 (Easterbrook, J., dissenting); see also Chatman, 986 F.2d at 1451. For example, courts have held that any crime that has as a statutory element "the threatened use of violence" constitutes a "crime of violence" per se, regardless of the facts surrounding the crime. Chatman, 986 F.2d at 1451. In the end, then, the phrase "crime of violence" captures crimes that are violent in an "abnormal sense." Poff, 926 F.2d at 594 (Easterbrook, J., dissenting).

But when we consider § 5K2.13, we find that the phrase "non-violent offense" appears without definition and cross-reference. Because the Commission has not provided otherwise, we first look to the "ordinary legal (and lay) understanding" of a "non-violent offense," a definition that excludes all crimes in which mayhem occurs. Id. (Easterbrook, J., dissenting). Although Judge Flaum has asserted that the definition of "crime

11

of violence" is not limited to situations involving career offenders, id. at 591, the lack of a cross-reference to § 4B1.2 is telling. The Guidelines often employ explicit cross-referencing, and "[i]t would have been easy to write § 5K2.13 to say that the judge may depart unless the defendant committed a `crime of violence.'" Id. at 594 (Easterbrook, J., dissenting).

For example, § 4A1.1, which guides computation of the criminal history category in the Sentencing Table, expressly adopts the definition of "crime of violence" set forth in § 4B1.2. See 1992 U.S.S.G. § 4A1.2(p). Thus, the use of a different phrase suggests that the Sentencing Commission intended a different meaning. See Poff, 926 F.2d at 594 (Easterbrook, J., dissenting). Furthermore, although the Commission has recently amended § 4B1.2 and its commentary twice, and the controversy over this issue has simmered, the Commission has not suggested any relationship between § 5K2.13 and § 4B1.2. See 1992 U.S.S.G. Appendix C 253-54, 284-85 (amendments 433, 461). Against this backdrop, the Commission's silence indicates that the provisions should be independently interpreted.[4]

B.

---

[4]The Poff majority interpreted the Commission's failure to reference § 5K2.13 in these amendments as tacit approval of the conclusion that the definition in § 4B1.2 extends to § 5K2.13. See Poff, 926 F.2d at 593. That position, however, rests on the erroneous belief that the courts of appeals have uniformly adopted the view espoused by the Poff majority. See, e.g., United States v. Spedalieri, 910 F.2d 707, 711 (10th Cir. 1990) (discussing application of § 5K2.13 without mentioning § 4B1.2). As noted above, they ultimately have not.

12

The significance of the absence of an explicit cross-reference is heightened by the obvious difference between the character of the downward departure provision and that of the career offender provision, a distinction of which the Commission was certainly aware. Section 5K2.13 is a guided departure, one that is thus "encouraged." See Koon v. United States, 116 S. Ct. 2035, 2045 (1996). Although a § 5K2.13 departure is tied to a judgment as to the extent to which reduced mental capacity contributed to the commission of the offense, a departure is optional, and elements of discretion permeate the provision.

Plainly, a Guideline provision that encourages the district court to exercise discretion to depart downward is the obverse of the career offender provision that in essence commands the harshest sentence possible under the circumstances by kicking up both the criminal history and base offense levels. This conclusion is not only buttressed but enhanced by the Supreme Court's decision in Koon. While the commentators are not in agreement as to the sweep and import of Koon, see 9 Fed. Sentencing Rep. 1 (1996) (symposium on Koon), they agree that Koon does signal that the federal sentencing judges have greater discretion in the fashioning of departures than was previously thought.[5]

---

[5] That the departure power also generally imports discretion is evident from the fact that unguided departures under § 5K2.0 (where the case is outside the "heartland," see 18 U.S.C. § 3553(b) and 1992 U.S.S.G. ch. 1 part A 5-6) require the sentencing judge to consider the factors set forth in 18 U.S.C. § 3553(a) which reference the kinds of (discretionary) factors that sentencing judges considered before the Guidelines.

Thus, the regime of departures contemplates the exercise of discretion by district judges to conform sentences to the actual crime committed, while the career offender provisions require judges to assume the worst. Indeed, in the course of identifying particular trends within an individual's criminal history, § 4B1.2 appears to characterize as "crime[s] of violence" many offenses that, taken individually on their facts, might be interpreted as non-violent. As Judge Easterbrook has put it, while "[t]he prospect of violence (the `heartland' of the offense, in the guidelines' argot) sets the presumptive range;" when the offender causes less turmoil than expected, "departure is permissible." Poff, 926 F.2d at 594 (Easterbrook, J., dissenting).[6]

C.

In short, some factors at work in the departure sections of the Guidelines are in tension with those at work under the career offender sections, and it does not make sense to import a career offender-based definition of "crime of violence" into a departure section in the absence of a specific cross-reference. Rather, it is better to permit the district courts to consider all the facts and circumstances surrounding the

_____

[6]As previously mentioned, Judge Flaum argues that the definition of "crime of violence" must govern § 5K2.13, for to hold otherwise would mean that a defendant could require additional incarceration because of his or her criminal history under § 4B1.2 and less incarceration because of the same history under § 5K2.13. Poff, 926 F.2d at 592. But this argument fails to understand the distinction between punishment based on the conduct constituting the elements of a crime and the actual conduct of the criminal.

14

commission of a crime when deciding whether it qualifies as a non-violent offense under § 5K2.13.  This rule furthers the sound policy of according the district courts discretion under the Guidelines regime wherever possible.

I note too that the mere fact that the case is a bank robbery does not make it ineligible for a § 5K2.13 departure. See Chatman, supra.  I acknowledge that Askari had his hand underneath his shirt when he handed the teller the note.  But he could not have been too frightening, because two bank employees chased him, which is an action they surely would have forgone had they thought he had a gun or was otherwise armed or dangerous. At all events, that determination should be a matter for the district court.

For the foregoing reasons, I believe that our decision in Rosen should be reconsidered by the Court en banc.