

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-8-1998

# United States v. Askari (Part II)

Precedential or Non-Precedential:

Docket 95-1662

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Askari (Part II)" (1998). *1998 Decisions.* Paper 72.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/72

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 8, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 95-1662

UNITED STATES OF AMERICA

v.

MUHAMMAD ASKARI,
        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 92-cr-00288)

Submitted Pursuant to Third Circuit LAR 34.1(a)
November 6, 1996
Before: BECKER, McKEE and GARTH, Circuit Judges

Argued En Banc October 29, 1997
Before: BECKER, Chief Judge; SLOVITER,* STAPLETON,
MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD,
ALITO, ROTH, LEWIS, McKEE, and GARTH,
Circuit Judges

(Filed April 8, 1998)

_____

*Judge Sloviter was Chief Judge of the Court of Appeals for the Third
Circuit at the time this appeal was argued. Judge Sloviter completed her
term as Chief Judge on January 31, 1998.

STAPLETON, Circuit Judge, concurring:

Although it is a close question, I, too, am persuaded that the content of the phrase "non-violent offense," as used in U.S.S.G. S 5K2.13, should not be determined by reference to the definition of the phrase "crime of violence" in U.S.S.G. S 4B1.2. I also conclude that a downward departure is not authorized by S 5K2.13 in this case. However, I reach that conclusion by a route somewhat different from that followed by the court.

Having concluded that the scope of the phrase "non-violent offense" in U.S.S.G. S 5K2.13 is not controlled by the scope of the phrase "crime of violence" in U.S.S.G. S 4B1.2, one must determine whether Askari's bank robbery offense constitutes a "non-violent offense" for the purposes of U.S.S.G. S 5K2.13. I conclude that it does not because a federal bank robbery conviction necessarily involves a finding that the offense involved actual force or a threat of force and such a finding, in my view, precludes characterization of the offense as a non-violent one for purposes of S 5K2.13.[1]

The Poff dissent took note not only of S 5K2.13's requirement that the offense of conviction be "non-violent," but also of its requirement that the defendant's criminal history not indicate a need to protect the public. Read together, this dual requirement suggested to the dissenting judges that S 5K2.13 was intended to authorize leniency for those individuals who suffer from diminished mental

_____

1. I use the term "bank robbery" in the traditional sense. Traditional bank robbery is proscribed by the first paragraph of 18 U.S.C. S 2113(a) which provides:

> [w]hoever, by force and violence, or by intimidation, takes, or
> attempts to take, from the person or presence of another, or
obtains
> or attempts to obtain by extortion any property or money or any
> other thing of value belonging to, or in the case, custody,
control,
> management, or possession of, any bank, credit union, or any
> savings and loan association.

While it has been suggested that a public official may be able to commit bank robbery by "extorting" bank funds without a threat of violence, I would not regard this as traditional bank robbery and I would take no position on the application of S 5K2.13 in such a case.

30

capacity that contributed to their crimes so long as neither the history of the defendant nor the character of the crime indicated a need for incapacitation. Against this background, the Poff dissent ultimately concluded that a "non-violent offense" is "one in which mayhem did not occur" -- one that "in the event did not entail violence." 926 F.2d at 594, 595. This conclusion suggests that leniency is available where the offense of conviction involved any sort of unrealized threat of violence so long as the defendant's criminal history does not indicate the need for incapacitation.

The Chatman court similarly read S 5K2.13 as intended to authorize leniency for those whose diminished mental capacity contributed to their crimes so long as neither the crime nor the criminal history indicates a need for incapacitation. It rejected, however, the position of the Poff dissent that unrealized threats of violence cannot render an offense a violent one. In the view of the Chatman court, "[s]ome offenses that never result in physical violence may, nonetheless, indicate that a defendant is exceedingly dangerous, and should be incapacitated." 986 F.2d at 1454. Thus, if the sentencing court determines that "an offense involved a real and serious threat of violence--such as an assault with a deadly weapon," it should conclude that it is not a "non-violent offense" for purposes of S 5K2.13. Id.. In the case before the Chatman court, the defendant had robbed a bank by handing a note to a teller demanding money and stating, "People will get hurt if I don't walk out of this bank." Id. at 1447. The case was remanded to the district court presumably for a determination of the defendant's state of mind.

Chatman and the Poff dissent both take the view that the sentencing court should look to the underlying facts to determine whether the offense was non-violent. I agree, although I believe it may be helpful for a sentencing court to take note of the essential elements of the crime of conviction, not because those elements control the U.S.S.G. S 5K2.13 issue in all cases, but rather because the findings necessarily implicit in a conviction may preclude it from being a "non-violent offense" within the meaning of U.S.S.G. S 5K2.13.2 Moreover, I take a somewhat different view of the scope of the phrase "non-violent offense."

_____

2. This is, of course, consistent with the obligation of a sentencing judge
to accept for sentencing purposes the facts necessarily implicit in the

31

Askari was charged with bank robbery under the first paragraph of 18 U.S.C. S 2113(a). That offense consists of taking, or attempting to take, anything of value, by force and violence, by intimidation, or by extortion. As the court's opinion demonstrates, the requirement that the property be taken either "by force and violence" or "by intimidation" requires proof of force or threat of force as an element of the offense, and in determining whether intimidation is present, the question is whether an ordinary person in the victim's position reasonably could infer a threat of bodily harm from the defendant's acts. As the court also notes, the term "extortion" as used in 18 U.S.C.S 2113(a) means obtaining property from another person, without the other person's consent, induced by the wrongful use of actual or threatened force, violence, or fear. Thus, in every case in which the defendant is convicted of bank robbery under the first paragraph of S 2113(a), there will be a beyond a reasonable doubt finding that the defendant was violent or engaged in conduct reasonably perceived as involving a threat of violence.

Under the view taken by the Poff dissent, afinding that the defendant's conduct was reasonably perceived as involving a threat of violence is not relevant to whether the

_____

jury's verdict. United States v. Boggi, 74 F.3d 470, 478–79 (3d Cir. 1996) ("the district court . . . properly reasoned that `a guilty verdict, not set
aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.' ") (quoting from United States v. Weston, 960 F.2d 212, 218 (1st Cir. 1992)). While this approach to U.S.S.C. S 5K2.13 produces the same result in a bank robbery case as that reached in Rosen, it is analytically distinct and will produce different results in other situations.
Under this approach, "nonviolent offense" as used in U.S.S.G. S 5K2.13 will (1) exclude from the scope of that section (i.e. exclude from consideration for a departure based on diminished capacity) offenses that would not be "crimes of violence" under U.S.S.G. S 4B1.2(1), as where force against the person of another or the threat thereof is not an essential element (e.g., transportation for purposes of prohibited sexual conduct), but such force or threat thereof is in fact used, and will (2) include in the scope of that section (i.e., include as candidates for such a departure) offenses that would be "crimes of violence" under U.S.S.G. S 4B1.2(1), as where the offense is burglary and no force against the person of another or threat thereof is employed.

32

offense is a "non-violent" one for purposes of S 5K2.13. Like the Chatman court, I reject that view. Section 5K2.13 clearly evidences an intent that there be no downward departure on grounds of diminished mental capacity where incapacitation appears necessary to protect the public, and, in many instances, a threat of violence will be strong evidence of such a need.

While it presents a closer issue, I also reject the Chatman court's view that whenever a S 5K2.13 motion is filed in a bank robbery case not involving actualized violence, the Sentencing Commission intended the sentencing court to determine whether the threat was a serious one that would have been acted on had events unfolded differently. Given that the issue turns on the Commission's intent, I look for guidance to the text of S 2B3.1, the "Robbery" Guideline, and the text of the criminal statute that guideline was intended to implement. Like most robbery statutes, the first paragraph of S 2113(a) does not distinguish between situations in which violence actually occurs and situations in which it is threatened but the threat is not realized.[3] Both are regarded as offenses of the same degree of seriousness. Similarly, S 2B3.1 does not distinguish

_____

3. Title 18 U.S.C. S 2113(a) provides for a maximum imprisonment of 20 years. Title 18 U.S.C. S 2113(d) provides:

> Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both.

On its face, this can be read as punishing bank robbers who engage in actual violence--specifically, assault--during the commission of their crime more severely than those who only threaten violence. This is not the correct reading of S 2113(d), however. In Simpson v. United States, 435 U.S. 6 (1978), the Supreme Court held that subsection (d) requires more than an assault and that " `the phrase `by the use of a dangerous weapon or device' must be read, regardless of punctuation, as modifying both the assault provision and the putting in jeopardy provision.' " Id. at 13 n.6. Hence, the goal of S 2113(d) is not to punish more severely the actual use of violence in bank robberies under S 2113(a), but rather to punish more severely "the use of a dangerous weapon or device" in such situations. 18 U.S.C. S 2113(d).

between these two situations. It does not, for example, establish a base offense level for S 2113(a) offenses and then provide for a specific offense characteristic increase for those situations in which violence actually occurs.[4]

It is my understanding that robberies involving violence and all robberies involving only threats of violence have traditionally been regarded as of equal seriousness because threats of violence necessarily hold an unacceptably high risk of realized violence whether emanating from the robber or from others attempting to respond to the threat. Because an unacceptably high risk of actualized violence and attendant injury exists without regard to whether the defendant expected to commit violence, our society has traditionally considered that factor to be irrelevant to the defendant's culpability in a robbery context.

I agree with the view that the limitations on the downward departure authority conferred by S 5K2.13 are intended to preclude lenity only where no need for incapacitation is indicated. I do not agree, however, that where a person threatens violence in the course of robbing a bank as a result of diminished mental capacity, no need for incapacitation is indicated in the event the sentencing judge believes the threat was not a "serious" one (i.e., probably would not have been carried out had events unfolded differently). As I have noted, the bank robbery statute deals with situations in which there is a high risk of actualized violence and attendant injury without regard to the state of the defendant's mind. Moreover, S 5K2.13 deals with situations in which diminished mental capacity has contributed to the commission of a crime. Thus, applying S 5K2.13 in a bank robbery context necessarily involves a crime with a high risk of actualized violence and a defendant with a diminished capacity to refrain from such high risk activity. That combination suggests to me a need for incapacitation and makes me reluctant to attribute to the Commission an intent to authorize S 5K2.13 downward departures in bank robbery cases. Because I find nothing in the Guidelines that compels such an attribution, I reject this portion of the Chatman court's decision.

---

4. U.S.S.G. S 2B3.1 does provide a specific offense characteristic increase
when violence results in personal injury but not for violence per se.

34

I would hold that the scope of the phrase "non-violent offense" in U.S.S.G. S 5K2.13 is not controlled by the scope of the phrase "crime of violence" in U.S.S.G. S 4B1.2. I would nevertheless further hold that a S 5K2.13 downward departure is not authorized where the offense of conviction is bank robbery.

Judge Sloviter joins this concurring opinion.

McKEE, Circuit Judge, concurring with whom Lewis, Circuit Judge, joins.

I agree with the majority's conclusion that the Sentencing Commission did not intend to import the "crime of violence" definition from the career offender provision of U.S.S.G. S 4B1.2 into U.S.S.G. S 5K2.13. I think the majority is correct in rejecting our prior holding in United States v. Rosen and the majority view in United States v. Poff in favor of the view espoused by Judge Easterbrook in his dissent in Poff. However, I write separately because the majority concludes that Askari's crime was not a "non-violent offense" based upon the elements of the crime. That is inconsistent with the approach taken by the dissent in Poff, and those jurisdictions that have followed Judge Easterbrook's reasoning. Rather than deny Askari a S 5K2.13 departure because of the elements of his crime, we should require an individualized inquiry into the specifics of his conduct to determine if his actual conduct amounts to a "non-violent offense" as that term is used in S 5K2.13, notwithstanding the elements of his crime. However, I nevertheless join in the judgment of my colleagues, because Askari's criminal history indicates that a departure under U.S.S.G. S 5K2.13 is not appropriate because of a need to protect the public.

I.

The majority properly rejects our prior holding in United States v. Rosen, 896 F.2d 789 (3d Cir. 1990). The majority's rejection of the reasoning of Rosen is grounded in Judge Easterbrook's dissent in United States v. Poff , 926 F.2d 588 (7th Cir. 1991), as well as the holding in United States v. Chatman, 986 F.2d 1446 (D.C. Cir. 1993), and United States v. Weddle, 30 F.3d 532, 540 (4th Cir. 1994). Maj. Op. at 17. However, the majority parts company with those cases insofar as those cases direct the sentencing court to engage in a fact-specific inquiry concerning the defendant's actual conduct, and the circumstances surrounding the offense, in order to determine if a particular offense is "non-violent" under S 5K2.13. Instead, the majority "take[s] a somewhat different view of the applicable standard." Maj. Op. at 21. It limits its inquiry here to the elements of the

36

crime of conviction and allows those elements to govern its determination of whether Askari committed a "non-violent offense" under S 5K2.13.

The majority reasons, "[i]f the elements of the crime require a finding of violent conduct, then a valid conviction can hardly permit a sentence based on a finding of non-violent conduct." Maj. Op. at 26. After considering the elements of Askari's robbery charge, the majority concludes that robbery under 18 U.S.C. S 2113(a)1 is a crime of violence barring any consideration as a "non-violent crime" under S 5K2.13. Under this approach, once a sentencing court concludes that the elements of a crime include violence or intimidation, a defendant is no longer eligible for the fact-specific, case by case inquiry that would otherwise govern a departure for a "significantly reduced mental capacity" under S 5K2.13. Although the majority's approach does have a certain logic and symmetry that is quite appealing, I am not persuaded that the analysis under S 5K2.13 ought to be as limited as the majority concludes.

The Sentencing Reform Act and the resulting Sentencing Guidelines have altered the relationship between the offense of conviction, and the criminal sanction that follows to the extent that the symmetry of the majority's analysis is no longer required or appropriate.2 As the majority correctly points out, the purposes of S 4B1.2 and S 5K2.13 are not the same. The factors that are relevant under S 4B1.2 are

_____

1. 18 U.S.C. S 2113(a) provides, in part, that:

    (a) Whoever, by force and violence, or by intimidation, takes, or
    attempts to take, from the person or presence of another, or
obtains
    or attempts to obtain by extortion any property or money or any
    other thing of value belonging to, or in the care, custody,
control,
    management, or possession of, any bank, credit union, or any
    savings and loan association.

2. See United States v. Watts, ___ U.S. ___, 117 S. Ct. 633 (1997) (sentencing court may consider conduct of which the jury acquitted a defendant in imposing a sentence following a conviction); United States v. Baird, 109 F.3d 856 (3d Cir.), cert. denied, 118 S. Ct. 243 (1997) (Guidelines allow a defendant to be sentenced based in part upon conduct contained in counts of an indictment that were dismissed pursuant to a plea bargain).

not necessarily relevant, or even appropriate, under S 5K2.13. My colleagues in the majority provide a very reasoned and convincing statement of why the definition of "crime of violence" cannot control whether a conviction is for a "non-violent offense" for purposes of a downward departure based upon "reduced mental capacity." However, the majority then restricts the meaning of "non-violent" offense under S 5K2.13 by the very definition that it holds does not apply under that Guideline. Section 4B1.2 defines "crime of violence" to include any offense that "has as an element the use, attempted use, or threatened use of physical force." However, today we adopt the reasoning of Judge Easterbrook's dissent in Poff, and the cases that have relied upon it. Under that rationale, a sentencing court should consider "all the facts and circumstances of a case in deciding whether a crime is a `non-violent offense' " under S 5K2.13. Chatman, 986 F.2d at 1453. Once we conclude that we erred in Rosen by restricting "non-violent offense" to the definition of "crime of violence," we need no longer tether our S 5K2.13 analysis to the definition in S 4B1.2 that we have just rejected. This point is best illustrated by Judge Easterbrook in his dissent in Poff:

> As the Commission was at pains to establish in S 4B1.2, whether a crime is one "of violence" depends on its elements and not on the defendant's conduct, so that an unrealized prospect of violence make the crime one of violence. This is an abnormal sense, a term of art. It took a detailed definition to make it so. Then comes S 5K2.13, in which "non-violent offense" appears without elaboration or cross-reference. Best to read these words in their ordinary sense rather than as tied to the term of art in S 4B1.2. A "non-violent offense" in ordinary legal (and lay) understanding is one in which mayhem did not occur. The prospect of violence (the "heartland" of the offense, in the guidelines' argot) sets the presumptive range; when things turn out better than they might, departure is permissible.

Poff, 926 F.2d at 594 (citation omitted) (emphasis added).

One of the purposes of the Sentencing Reform Act was to increase uniformity in sentencing by reducing disparities in sentencing. See U.S. Sentencing Guidelines Manual, ch. 1,

38

pt. A, at A3 (U.S.S.G.). However, another important purpose was to increase proportionality in sentencing by imposing different sentences for crimes representing different levels of culpability. Id. To reconcile these seemingly contrary goals, the Commission, inter alia, provided for departures outside of the guideline range. See U.S.S.G. S 5K2.0. A policy that restricts departures based solely upon the elements of an offense is inconsistent with the Commission's attempt to apportion sanctions based upon culpability. Although we may properly conclude that one who commits a more serious crime is more culpable than one who commits a less serious one, that equation does not work where the more serious crime is committed by one who is less culpable because of a reduced mental capacity. "The criminal justice system long has meted out lower sentences to persons who, although not technically insane, are not in full command of their actions." Poff, 926 F.2d at 594 (Easterbrook, J., dissenting). Moreover, "[s]carce resources and prison space achieve greater deterrence when deployed against those who are most responsive to the legal system's threats and who pose the greatest danger if not deterred." Id. at 595.

Thus, in Chatman, which the majority here cites with approval, see Maj. Op. at 19-20, the court held that a defendant was eligible for a downward departure under S 5K2.13 even though he (like Askari) came before the sentencing court convicted of bank robbery. There, the district court had opined that the defendant was ineligible for a S 5K2.13 departure because he had given a teller a threatening note during the bank robbery. The sentencing court concluded that the defendant's conduct therefore amounted to a crime of violence. Id. at 1447. The Court of Appeals for the D.C. Circuit relied upon Judge Easterbrook's dissent in Poff, and reversed. The court reasoned that S 5K2.13 vested a sentencing court with broad discretion to consider all the relevant facts concerning the offense because the Commission's purpose was "to treat with lenity those individuals whose`reduced mental capacity' contributed to [sic] commission of a crime." Id. at 1452.

> In contrast to the purposes of section 4B1.2, the point
> of section 5K2.13 is to treat with leniency those

individuals whose reduced mental capacity contributed to commission of a crime. Such lenity is appropriate in part because, as Judge Easterbrook points out, two of the primary rationales for punishing an individual by incarceration -- desert and deterrence -- lose some of their relevance when applied to those with reduced mental capacity. . . .

. . . .

Considered in this context, the term "non-violent offense" in section 5K2.13 refers to those offenses that, in the act, reveal that a defendant is not dangerous, and therefore need not be incapacitated for the period of time the Guidelines would otherwise recommend. A determination regarding the dangerousness of a defendant, as manifested in the particular details of a single crime that he or she has committed, is best reached through a fact-specific investigation.

Id. (citations omitted).

Likewise, the Court of Appeals for the Ninth Circuit in United States v. Cantu was persuaded that a sentencing court's inquiry into a defendant's eligibility under S 5K2.13 should be undertaken with a view toward lenity. 12 F.3d 1506, 1510 (9th Cir. 1993)(citation omitted). There, the court agreed with the analysis in Chatman, and noted that "[l]enity is appropriate because the purpose of S 5K2.13 is to treat with some compassion those in whom a reduced mental capacity has contributed to the commission of a crime." Id. Although the court in Cantu was concerned with whether post-traumatic stress disorder could cause reduced mental capacity under the Guidelines not with whether the defendant committed a "non-violent offense," the court recognized that fact-specific inquiries must be undertaken to determine both the defendant's mental condition and the circumstances of the offense. See also, United States v. McBroom, 124 F.3d 533, 547 (3d Cir. 1997) ("Section 5K2.13 is intended to create lenity for those whose significantly reduced mental capacity cause them to commit the offense of conviction.").

Thus, I conclude that Askari is not ineligible for a S 5K2.13 departure solely because of his robbery conviction.

40

The record shows that, although Askari had his hand underneath his shirt when he ordered the bank teller to give him money, two bank employees chased him from the bank. I submit, therefore, there is a genuine issue as to just how frightening or intimidating he was during the commission of the crime. However, I do not minimize the intimidation of the bank teller whom Askari confronted. See Maj. Op. at 27. Instead, the teller's reaction should be assessed along with all of the other evidence in concluding whether, based upon the totality of the circumstances, Askari committed a "non-violent offense" under S 5K2.13. A sentencing court should make that determination independently of the definition contained in S 4B1.2 (which, as noted above, includes the elements of the offense). Barring other considerations, a defendant's eligibility for a S 5K2.13 departure can be determined only after the completion of such an individualized inquiry.

II.

Despite my disagreement with the conclusion of the majority of my colleagues, I agree with the majority's ultimate decision to affirm the sentence because there are additional considerations under the departure provision. Section 5K2.13 is not only restricted to persons whose offense is non-violent, it also requires that "a defendant's criminal history does not indicate a need for incarceration to protect the public." See U.S.S.G.S 5K2.13. Here, the district court noted that Askari had a long history of crime, including violent crime. (App. at 56a.) Therefore, I agree that regardless of whether or not the bank robbery in this case is classified as a "non-violent offense," Askari is ineligible for the departure because his criminal history does suggest a need to protect the public. Thus, I concur in the judgment of the majority.

41

GARTH, Circuit Judge, concurring:

I agree that the order of the district court should be affirmed. However, I reach this result by relying on the logic and common sense of Judge Seitz's opinion for our court in United States v. Rosen, 896 F.2d 789 (3d Cir. 1990), and its conclusion that the term "non-violent offense" cannot mean something other than the opposite of a "crime of violence."

Rosen teaches that a defendant who has committed a "crime of violence" according to USSG S 4B1.2(a) is not eligible for a downward departure for commission of a "non-violent offense" with reduced mental capacity under USSG S 5K2.13. See id. at 791. Because Askari was convicted of a "crime of violence," namely bank robbery, he is obviously ineligible to receive the grant of a downward departure authorized by S 5K2.13 and the order of the district court imposing a sentence of 210 months in prison should be affirmed.

The court today correctly affirms the order of the district court, but on its path to doing so, rejects Rosen. My colleagues take the position that the "crime of violence" definition of USSG S 4B1.2(a) should not be used to determine whether a defendant has committed a "non-violent offense" according USSG S 5K2.13. For essentially those reasons stated by the Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits, I do not find this position persuasive. See United States v. Mayotte, 76 F.3d 887, 889 (8th Cir. 1996); United States v. Poff, 926 F.2d 588, 591-93 (7th Cir. 1991) (en banc); United States v. Russell, 917 F.2d 512, 517 (11th Cir. 1990); United States v. Maddalena, 893 F.2d 815, 819 (6th Cir. 1989); United States v. Borrayo, 898 F.2d 91, 94 (9th Cir. 1989); see also United States v. Chatman, 986 F.2d 1446, 1454-55 (D.C. Cir. 1993) (D.H. Ginsburg, J., concurring).

In light of the many opinions on this issue already found in the Federal Reporter, I feel no need to rehash the familiar arguments in favor of Rosen.3 However, our court's

_____

3. Briefly, however, the pro-Rosen arguments may be summarized as follows. First, common sense dictates that a "non-violent offense" is the converse of a "crime of violence." Second, the parallel structure of

inability to agree on a standard to replace Rosen provides a new perspective from which to appreciate its strength.

Having agreed to reject Rosen's teaching that a "non-violent offense" is defined by S 4B1.2(a), my colleagues have diverged in their efforts to come up with a new definition. Reaching back to first principles of "modern criminology," the majority has promulgated a definition of "non-violent offense" that it believes will respond to "the need for the sentence imposed to reflect the seriousness of the offense, to protect the public, and to provide just punishment." Maj. Op. at 23. Under the majority rule,

> departures under USSG S 5K2.13 exclude conduct that involves actual force, threat of force, or intimidation, the latter two measured under a reasonable person standard. Therefore, "non-violent offenses" under USSG S 5K2.13 are those which do not involve a reasonable perception that force against persons may be used in committing the offense.

Maj. Op. at 26 (emphasis added). Accordingly, the district court must examine "the elements of the crime and the surrounding conduct" to determine whether there was actual force or a reasonable perception of a threat of force.

In their concurrences, Judge Stapleton and Judge McKee offer different approaches. Following conviction of a crime involving threats of violence that were not executed, Judge Stapleton would have the district court look to the underlying criminal statute and the relevant section of Chapter 2 of the Guidelines. If the district court could discern from these texts an intent to award lighter sentences to defendants who were unlikely to carry out

_____

S 4B1.1 and S 5K2.13 suggests that the same definition should be used to assess whether the violent nature of a defendant's crime should support a modification of the defendant's sentence. Third, the Guidelines should be read as a whole, and when the same word appears in related sections, we should assume that the word carries the same meaning in both. Fourth, the term "crime of violence" is a broad phrase that appears in other sections of the Guidelines apart from S 4B1.1. See, e.g., USSG SS 2K2.1, 2K1.3, 4A1.1. Its meaning therefore can be exported to S 5K2.13 as well as to these other sections.

43

their threats of violence, Judge Stapleton would allow a defendant who appears unlikely to have carried out a threat of violence to be eligible for a downward departure under S 5K2.13. Judge McKee offers yet another approach to defining "non-violent offense." In his concurrence, Judge McKee advocates a totality of the circumstances test, in which a district court would be required to conduct an individualized inquiry into the specifics of the defendant's conduct to determine whether it constituted a "non-violent offense."

As I see it, our court's inability to agree on a definition of "non-violent offense" in S 5K2.13 illustrates the wisdom of Rosen. By utilizing S 4B1.2(a), Rosen harnessed the Sentencing Commission's efforts to delineate the boundaries between violent and non-violent conduct. The Commission produced a clear rule. When linked to S 5K2.13 by Rosen, the result was simple and straightforward guidance that produced sensible results: defendants convicted of offenses involving the use, attempted use, or threatened use of physical force against a person, or whose behavior presented a serious potential risk of physical injury to others, were ineligible for a reduced sentence due to diminished capacity. By rejecting Rosen, our court has created the need to fashion a standard that at best can only replicate the efforts of the Commission codified at S 4B1.2(a).

I do take some solace in the fact that the majority's new standard for evaluating departures appears to do just that. Indeed, it seems that the majority has gone out of its way to reject Rosen in theory but has embraced it in fact. Looking at the majority's new definition of "non-violent offense," I am hard pressed to think of a case in which the definition would produce a result different from Rosen: that is, when a defendant's action would not involve "actual force, threat of force, or intimidation, the latter two measured under a reasonable person standard," but nonetheless would qualify as a "crime of violence" according to USSG S 4B1.2(a).

The court's attempt to conjure up such an example appears in part IIID of the majority's opinion. There, the court imagines extortion by a public official in violation of

the Hobbs Act. In order to come within the court's new standard, a public official with a diminished mental capacity not the result of voluntary intake of alcohol or drugs, acting under color of right, would have to extort funds in violation of the Hobbs Act in a way that did not involve a threat of force, as judged by a reasonable person. In such a case, the court hypothesizes, that official would be eligible for a S 5K2.13 departure under the court's new standard but not under Rosen.

I have never heard of such a prosecution. Nor have I been able to locate any published reports of one. Indeed, as the dissent notes, it is not even clear that the majority's rule would produce a different result than Rosen given such a set of facts. See Dissenting Op. at n.2. Thus, it appears that the majority has rejected Rosen in theory but not in substance: it has fashioned from first principles a new rule that appears to mirror Rosen in every set of facts that has been known to arise. This being so, I see no reason to abandon our Rosen rule, with which five other circuits have agreed.

BECKER, Chief Circuit Judge, Dissenting.

I join in Parts I, II, and IIIA, B, & C of the majority opinion, which overrule United States v. Rosen, 896 F.2d 789 (3d Cir. 1990), and hold that Rosen's determination that "non-violent offense" as used in U.S.S.G. S 5K2.13 should be controlled by the definition of "crime of violence" used elsewhere in the Sentencing Guidelines was incorrect. Judge Scirica's analysis in these segments of his opinion is not only sound but itself clearly demonstrates why the only appropriate and logical course is to permit the district courts to consider all the facts and circumstances surrounding the commission of a crime when deciding whether that crime qualifies as a non-violent offense under S 5K2.13.

In Part IIID, however, the court holds that (and attempts to explain why) we should preclude sentencing judges from granting S 5K2.13 departures in "traditional" bank robbery cases.1 After invoking the Sentencing Reform Act, 18 U.S.C. S 3553, and exploring the terms of the bank robbery statute, 18 U.S.C. S 2113(a), the court defines "non-violent offense" as those offenses "which do not involve a reasonable perception that force against persons may be used in committing the offense." Op. at 26. The court also states that:

> It would seem, therefore, that with bank robbery convictions under the first paragraph of 18 U.S.C. S 2113(a), a defendant could not qualify for a departure under USSG S 5K2.13 as presently written. . . . [i]f the elements of the crime require a finding of violent conduct, then a valid conviction could hardly permit a sentence based on a finding of non-violent conduct.

Id. at 29, 31.

I do not believe that there any persuasive reasons to support the categorical exclusion from S 5K2.13 of offense conduct that the analysis in the first segments of Part III would have otherwise left to fact specific consideration by

_____

1. I adopt Judge Stapleton's reference to "traditional" bank robbery as that conduct proscribed by the first paragraph of 18 U.S.C. S 2113(a). See Concurr. Op. (Stapleton) at 30.

46

the sentencing judge. That is because, as those circuits that have already rejected the Rosen approach have concluded, the policies behind the departure provisions are distinct from (and often in tension with) the career offender and substantive offense guidelines, and that it accordingly does not make sense to assess whether an offense is "non-violent" based on the statutory elements of the crime. Unlike the majority, I would follow that logic to its conclusion. That logic, I note, is buttressed by Judge McKee's and Judge Garth's concurring opinions.

I

Section 5K2.13 of the Guidelines is a policy statement authorizing sentencing judges to downwardly depart in circumstances when the offender is found to have been "suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants." Section 5K2.13 is a guided departure, one that is thus "encouraged." See Koon v. United States, 116 S.Ct. 2035, 2045 (1996). Although a S 5K2.13 departure depends upon a judgment as to the extent to which reduced mental capacity contributed to the commission of the offense, a departure is optional, and elements of discretion are plainly present.

The critical limitation on the ability of the sentencing judge to grant a S 5K2.13 departure is that the defendant must have committed a "non-violent offense." This term is not, as the majority notes, defined anywhere in the Guidelines. In Rosen, we adopted a definition based on "crime of violence," a term of art used in S 4B1.1, the career offender provision, and defined in S 4B1.2. Unlike S 5K2.13, which permits sentencing judges to exercise leniency in appropriate circumstances, S 4B1.1 mandates that a certain class of recidivist offenders receive the harshest sentence possible under the circumstances by ratcheting up both the criminal history and base offense levels.

A

The effect of Rosen was that, by applying the "crime of violence" standard to the "non-violent offense" analysis, the

47

sentencing judge would be bound by the statutory elements of the offense in determining whether the crime was "non-violent." This is because a "crime of violence" is defined as an offense that "has an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. S 4B1.2; see also United States v. Poff, 926 F.2d 588, 594 (7th Cir. 1991) (en banc) (Easterbrook, J., dissenting) ("[W]hether a crime is one `of violence' depends on its elements and not on the defendant's conduct."). What actually happened is not relevant; the court need only look to the elements of the offense of conviction. Accordingly, since the crime of bank robbery is defined to include force or intimidation, see 18 U.S.C. S 2113(a), it could never be found to be a non-violent offense under the Rosen construction.2

The majority rejects Rosen in favor of the contrary view expressed in United States v. Weddle, 30 F.3d 532, 540 (4th Cir. 1994), United States v. Chatman, 986 F.2d 1446 (D.C. Cir. 1993), and in Judge Easterbrook's noted dissent in Poff. These cases demonstrate why we must necessarily examine the facts of the offense to determine whether "significantly reduced mental capacity" could be a ground for lenience at sentencing. As Judge Edwards summarized in Chatman:

> [T]he point of section 5K2.13 is to treat with lenity those individuals whose "reduced mental capacity" contributed to the commission of a crime. Such lenity is appropriate because, as Judge Easterbrook points out, two of the primary rationales for punishing an individual by incarceration -- desert and deterrence -- lose some of their relevance when applied to those with reduced mental capacity. As to desert, "[p]ersons who find it difficult to control their conduct do not -- considerations of dangerousness to one side -- deserve as much punishment as those who act maliciously or for gain." Poff, 926 F.2d at 595 (Easterbrook, J.

_____

2. The majority concedes as much. See Op. at 9-10 ("If `non-violent' offense in USSG S 5K2.13 is defined by reference to the term `crime of violence' in USSG S 4B1.2 and its commentary, then bank robbery would never qualify as a `non-violent' offense.").

48

dissenting). Further, "[b]ecause legal sanctions are less effective with persons suffering from mental abnormalities, a system of punishment based on deterrence also curtails its sanction." Id. . . .

[W]hen an individual with "significantly reduced mental capacity" does not pose a danger to the public, and thus does not need to be incapacitated, that individual is eligible for a downward departure.

Considered in this context, the term "non-violent offense" in section 5K2.13 refers to those offenses that, in the act, reveal that a defendant is not dangerous, and therefore need not be incapacitated for the period of time the Guidelines would otherwise recommend. . . . A determination regarding the dangerousness of a defendant, as manifested in the particular details of a single crime that he or she has committed, is best reached through a fact-specific investigation.

Chatman, 986 F.2d at 1452 (internal citations omitted). The majority also recognizes this policy foundation, finding that U.S.S.G. S 5K2.13 "encourages more lenient treatment for persons who are not actually dangerous but whose reduced mental capacity contributed to the commission of a crime." See Op. at 21 (emphasis added).

The policy rationale discussed in Chatman, in conjunction with the discretionary nature of S 5K2.13 discussed supra, counsels that sentencing judges must be given the ability to examine the facts of the offense to determine whether a diminished capacity departure is appropriate. To that end, Weddle, Chatman, and the Poff dissent all reject the Rosen approach in favor of a fact-specific inquiry. See Chatman, 986 F.2d at 1452 ("We therefore believe that a District Court, when deciding whether a particular crime qualifies as a `non-violent offense,' should consider all the facts and circumstances surrounding the commission of the crime."); Weddle, 30 F.3d at 540 (agreeing with the Chatman fact-specific approach); Poff, 926 F.2d at 595 (Easterbrook, J., dissenting) (concluding that "non-violent offense" refers to "crimes that in the event did not entail violence."). Thus, the essential distinction between Chatman and Rosen is

49

whether the statutory definition of the crime or the facts of
the offense will be outcome determinative.3

Yet, while the majority ostensibly rejects Rosen and
claims to find the arguments in Chatman, Weddle, and the
Poff dissent "convincing," see Op. at 20, it does not fully
adopt the fact-based inquiry necessary to its own position.
Instead, the majority posits that the district court should
"look at" the facts of the offense, but should do so "within
the context of the Sentencing Reform Act and the
underlying statute defining criminal culpability." See id. at
22. It then directs courts to "assess the seriousness of the
offense" to determine whether a departure is warranted by
looking "to the elements of the crime and the surrounding
conduct." Id. at 23. And while the majority holds that "non-
violent offense" should be defined based on the "reasonable
perception that force against persons may be used" --
which sounds more like a fact specific inquiry-- it
concludes that:

> If the elements of the crime require a finding of violent
> conduct, then a valid conviction could hardly permit a
> sentence based on a finding of non-violent conduct. So
> long as the bank robbery victim has been threatened
> with harm, and is seen to have been threatened under
> an objective standard (reasonable person), the
> defendant cannot be found to have acted in a non-
> violent manner.

_____

3. I note that the circuit split on the question presently before us has
caught the attention of the U.S. Sentencing Commission, which has
recently proposed four alternative amendments to S 5K2.13. See 62
Crim. L. Rep. 2051, 2078-79 (Jan. 21, 1998). Option one corresponds to
the Rosen - Poff majority view. Option two corresponds to the Chatman
fact-intensive view. Option three, a variation on the Chatman view,
"defines the scope of the departure to exclude cases that involve actual
violence or a serious threat of violence." Id. at 2078. Finally, option
four
broadens the scope of the departure by eliminating the "non-violent
offense" limitation altogether. See id. It is interesting that the
Commission, obviously influenced by the force of Judge Easterbrook's
Poff dissent, which it explicitly references, appears to be in doubt over
the best course to take. Unlike many of the other proposals for
amendment it has made in the past, the Commission proposes four
distinct options rather than taking a definite stance on this issue.

Id. at 26.

Since the applicable provision of 18 U.S.C. S 2113(a) has as a statutory element actual or threatened force (the latter measured under an objective standard), by definition an offender convicted of traditional bank robbery could never be found to have committed a "non-violent" offense. Thus, under the majority's construction of Chatman, Muhammad Askari could not qualify for a departure under S 5K2.13 regardless of the factual circumstances underlying his offense. To that end, the majority's proposed "reasonable perception" standard does not save its opinion from being analytically identical to Rosen. As Judge McKee explains in his concurring opinion, under the majority's reasoning "once a sentencing court concludes that the elements of a crime include violence or intimidation, a defendant is no longer eligible for the fact-specific, case by case inquiry that would otherwise govern a departure . . . under S 5K2.13." Concurr. Op. (McKee) at 37. In other words, in such a circumstance the majority directs us not to consider whether the facts of the case constitute a real expression or threat of violence, but whether the crime itself is "of violence." This restricts the meaning of "non-violent offense" by "the very definition [the majority] holds does not apply." See Concurr. Op. (McKee) at 38.

I fail to see how this approach, which appears to credit Judge Easterbrook's reasoning, is substantially different from a straightforward application of Rosen or the majority view in Poff. As Judge Garth aptly opines in his concurring opinion, the majority has "gone out of its way to reject Rosen in theory but has embraced it in fact." See Concurr. Op. (Garth) at 44. I observe that the majority has properly rejected Rosen in theory, but has gone out of its way to embrace it in fact.

B

It is important that we pause and recognize the significance of what the majority holds today. As the majority correctly notes, one element of the applicable bank robbery statute is that the offender takes property either "by force and violence" or "by intimidation." See Op. at 12.

51

As discussed, it is this element of the offense that seals Muhammad Askari's fate. However, as the majority also notes, to prove "intimidation," the government need only show that an "ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts." Id. (citing United States v. Woodrup, 86 F.3d 359, 363 (4th Cir.), cert. denied, 117 S. Ct. 332 (1996). This means that a defendant whose diminished mental capacity at the time of the offense is beyond cavil could be precluded from a S 5K2.13 departure despite a record that clearly demonstrates that (a) there was no actual violence; (b) there was no real chance of violence being carried out; and (c) no one in the bank at the time of the robbery actually felt threatened by the defendant. This result cannot be consistent with the desert and deterrence rationales discussed supra and impliedly embraced by the majority.4

_____

4. The majority attempts in Part IIID of its opinion to suggest a set of circumstances in which an offender convicted of bank robbery still could qualify for a S 5K2.13 departure. In the majority's hypothetical, a public official could commit bank robbery by extortion in violation of the Hobbs Act, 18 U.S.C. S 1951(b)(2) without force or the threat of force. See Op. at 25-26. As Judge Garth suggests in his concurring opinion, this is a somewhat far-fetched set of facts, and is not particularly helpful in deciding whether the rule the majority fashions today is distinguishable from Rosen. I would also add that the majority's example, on its own facts, although styled as a "bank robbery" would appear to involve instead a prosecution under the Hobbs Act -- which does not have as a necessary element the use of force or the threat of force. See United States v. Addonizio, 451 F.2d 49, 72 (3d Cir. 1972) (indicating that Hobbs Act violation can be based on fear of economic loss). In that case, the majority's hypothetical defendant could be eligible for a S 5K2.13 departure even under Rosen. If, on the other hand, the majority's example would entail a prosecution under 18 U.S.C. S 2113(a), by the terms of the majority's own opinion a diminished capacity departure would be precluded. See Op. at 25 ("It would seem, therefore, that with bank robbery convictions under the first paragraph of 18 U.S.C. S 2113(a) [including extortionate acts], a defendant could not qualify for a departure under USSG S 5K2.13 as presently written.").

In order to distinguish itself from Rosen, the majority would need to generate a hypothetical under the first paragraph of 18 U.S.C. S 2113(a) that would not foreclose a diminished capacity departure. This the

52

In contrast, to be consistent with its reasoning in Part IIIC, the majority should have modeled its result in Part IIID on Chatman. The facts of Chatman are just like those presently before us. The unarmed defendant walked into a bank, passed the teller a note demanding money, and threatened violence otherwise. The defendant left the bank without incident and was captured by the police soon thereafter. Since it was unclear from the record whether the district court had assessed the specific facts of the case and exercised its discretion to depart, or whether it had categorically rejected the S 5K2.13 departure based on the statutory definition of bank robbery, the D.C. Circuit remanded for a resentencing. See Chatman, 986 F.2d at 1454. The same result should obtain here. As in Chatman, the district court rejected the S 5K2.13 departure not on the facts, but because it believed (correctly, as things have turned out) that it was precluded from departing based on the elements of the crime. But as Judge McKee states, once we have rejected Rosen, "we need no longer tether our S 5K2.13 analysis to the definition in S 4B1.2 that we have just rejected." Concurr. op. (McKee) at 38.5

II

Judge Stapleton, writing separately, also agrees that the definition of "non-violent offense" used in S 5K2.13 should

_____

majority has not done. See also Concurr. Op. (Stapleton) at n.1 ("While it has been suggested that a public official may be able to commit bank robbery by "extorting" bank funds without a threat of violence, I would not regard this as traditional bank robbery and I would take no position on the application of S 5K2.13 in such a case.").

5. Both the majority in Part IIIE and Judge McKee's concurrence conclude that we should also affirm the district court's denial of a departure pursuant to S 5K2.13 because Askari's criminal history suggests a need to protect the public. While it is true that to be eligible
for a diminished capacity departure, S 5K2.13 requires that "a defendant's criminal history does not indicate a need for incarceration to protect the public," and while the district court found that Askari has a long history of crime, the district court did not expressly make a finding about the need for incarceration in this case. I believe that that determination should be made by the district court in the first instance.

not be controlled by the definition of "crime of violence" used in the career offender provision, S 4B1.1. However, like the majority, he concludes that a downward departure is not warranted in traditional bank robbery cases. Although Judge Stapleton's rationale differs somewhat from the majority's, I believe that it still comes up short.

Judge Stapleton's reasoning can be summarized as follows. First, he rejects Judge Easterbrook's view that the findings of the jury at the guilt phase with respect to the defendant's use of violence or threats are essentially irrelevant at the departure phase. See Concurr. Op. (Stapleton) at 34. Judge Stapleton believes, like the majority, that if a conviction for bank robbery necessarily entails a jury finding that the defendant's conduct was, at least, reasonably perceived as involving a threat of violence, this finding should preclude characterization of the offense as "non-violent" for S 5K2.13 purposes. See id. at 30, 34. The difference between this view and Rosen, according to Judge Stapleton, is that while Rosen mandates that the elements of the offense control the outcome in all cases, under the Stapleton view the elements do not always control, but rather the "findings necessarily implicit in a conviction may preclude" characterization of the offense as "non-violent." See id. at 31.

Accordingly, Judge Stapleton also rejects the Chatman view that whenever a S 5K2.13 motion is made in a bank robbery case involving unrealized violence, the sentencing court should have the opportunity to make an independent determination whether or not the threat "was a serious one that would have been acted on had events unfolded differently." See id. at 33.6  His rejection of the need for such

---

6. The Chatman court disagreed with the Poff dissent to the extent that Judge Easterbrook's opinion could be read to suggest that any crime that does not actually involve physical violence is a "non-violent offense."
See Chatman, 986 F.2d at 1454. The court found instead that some offenses that did not actually result in violence may suggest that the defendant is "exceedingly dangerous" and needs to be incapacitated. See id. The court described such offenses as those which "involved a real and serious threat of violence," and included as an example assault with a deadly weapon. See id. This determination, however, was left to the district court.

54

factual findings is premised on a belief that the Sentencing Commission intended the Guidelines to follow the "traditional view" that crimes involving violence and crimes involving only threats of violence are regarded as being of equal seriousness. Based on an examination of the text of both the robbery guideline and the robbery statute, he finds no distinction between realized violence and unrealized threats. Accordingly, Judge Stapleton concludes that the Commission did not intend to authorize downward departures in traditional bank robbery cases involving only unrealized threats. See id. at 34. Hence, Judge Stapleton is of the view that an offense involving an unrealized threat could never be "non-violent."

I disagree with this analysis for two reasons. First, I am not persuaded that Judge Stapleton's reliance on "the findings necessarily implicit in a conviction" is analytically distinguishable from the Rosen approach. The findings that are necessary to a conviction for a given offense will always be equivalent to the statutory elements of that offense -- that is, to say that implicit in a bank robbery conviction is a jury finding that there was a reasonable inference of a threat of bodily harm is no different from saying that the bank robbery statute requires the government to prove that the victims reasonably felt threatened. Thus, it makes no sense to me to hold that the sentencing court should "look to the underlying facts," see Concurr. Op. (Stapleton) at 31, while simultaneously holding that a departure could be precluded by "implicit" facts -- i.e. the elements of -- the conviction. I reiterate the point made by both Judges McKee and Garth that there is no difference between the Rosen "crime of violence" approach and an approach by which the decision to depart is per se precluded by the statutory elements of the offense. See Concurr. Op. (McKee) at 38; Concurr. op. (Garth) at 51-52. Judge Stapleton's first conclusion cannot be consistent with a rejection of Rosen.

Second, Judge Stapleton's conclusion that the Commission has adopted the "traditional view" that threats and actual violence should be treated the same in the departure context is equally problematic. As the majority's analysis of Poff, Chatman, and Weddle amply indicates, a major reason why we have rejected the Rosen analysis is

55

that the policy goals driving the departure provisions are significantly different from the policy goals motivating the other portions of the Guidelines. See Op. at 18–19, 21; see also Chatman, 986 F.2d at 1452. Thus, while it may make good policy sense to treat bank robbery offenders who use violence the same as those who only threaten violence for purposes of computing the applicable base offense level, different policy goals are implicated when it comes to the departure decision, and in that context it does not necessarily make sense to treat empty threats and actual violence as per se the same.

Furthermore, as Judge McKee explains in his concurring opinion, the "Sentencing Reform Act and the resulting Sentencing Guidelines have altered the relationship between the offense of conviction, and the criminal sanction that follows." Concurr. Op. (McKee) at 37. To use Guidelines vocabulary, the "heartland" of the offense sets the presumptive sanction range by way of the base offense level. In the bank robbery context, that heartland is defined by the mere prospect of violence. See Poff, 926 F.2d at 594 (Easterbrook, J., dissenting). Thus, the presumptive sanction is the same whether the offense involved actual violence or the threat of violence. Section 5K2.13, however, is concerned with whether the offense conduct is indicative of a need for the standard incapacitation entailed by a given offense or whether the conduct is more indicative of a mental illness, and thus society has a lesser need to incapacitate. See Chatman, 986 F.2d at 1452 (discussing incapacitation rationale). Thus, when "things turn out better than they might" and violence does not actually occur, a departure becomes permissible. Poff, 926 F.2d at 594 (Easterbrook, J., dissenting). In that light, whether the offender was actually violent or posed a real threat of violence, or whether he presented a threat that was unlikely to have been realized, is a central and necessary factual distinction in the departure context. Thus, it does not necessarily follow that because the robbery offense guideline does not distinguish between realized and unrealized violence that the departure provisions should similarly not make such a distinction.

Moreover, it is not even obvious that the robbery offense

56

guideline does not fully distinguish between "situations in which violence actually occurs and situations in which it is threatened but the threat is not realized." Concurr. Op. (Stapleton) at 33. Judge Stapleton is correct that S 2B3.1, the robbery offense guideline, does not provide for a specific base level enhancement for violence per se. However, S 2B3.1(b)(3) mandates a graduated offense level increase if the victim of the robbery sustained a bodily injury.[7] I recognize that there can be crimes where violent conduct occurs but does not result in bodily injury, and thus this enhancement does not squarely refute Judge Stapleton's argument. See United States v. Harris, 44 F.3d 1206, 1218 (3d Cir. 1995) (finding that there will be crimes where the offender will use mace but will not cause bodily injury to victims). At the same time, it seems plausible to read into this provision an intent of the Commission to treat serious threats the same as violence only when that violence does not result in injury. Since threats by themselves cannot cause bodily injuries, see United States v. Sawyer, 115 F.3d 857, 859 (11th Cir. 1997) (holding that psychological injury by itself cannot support an enhancement under S 2B3.1(b)(3)), the Commission clearly intended to treat legitimate threats and substantial violence differently. Perhaps, then, the Commission did not adopt Judge Stapleton's "traditional view" wholesale after all.[8]

In sum, I would follow the principles advanced in

_____

7. Section 2B3.1(b)(3) provides, in part:

> If any victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

| Degree of Bodily Injury | Increase in Level |
| --- | --- |
| (A) Bodily Injury | add 2 |
| (B) Serious Bodily Injury | add 4 |
| (C) Permanent or Life-Threatening Bodily Injury | add 6 |

8. Even accepting that the Commission did not intend to distinguish between violent offenses and offenses involving a real threat to violence in the departure context, that does not change the fact that the sentencing court needs to examine the offense conduct to determine if the threat was real enough to justify being treated like actual violence in the departure context.

57

Chatman, Weddle and the Poff dissent. Even if there is a reasonable perception of a threat by the bank teller that justifies a conviction and a base offense level that is the same as if the offender had used actual violence, the policy goals underlying Chapter Five of the Guidelines are different from the policies underlying the substantive offense provisions, and thus the jury's factual determinations should not necessarily preclude a departure.

III

The improvidence of the majority view is demonstrated by a recent highly publicized incident in the Philadelphia area. In December of 1997, in a drama resembling the one currently before us, the mayor of Darby Borough, Pennsylvania, a beloved and respected long-time member of the community, walked into a local bank in broad daylight and told a teller "This is a robbery. I have a bomb on me." See Lisa Sandberg, Darby Mayor Held in Bank Heist, Philadelphia Inquirer, Dec. 28, 1997, at B5. Apparently the mayor walked out with $1,500, but surrendered to authorities about one half-hour later. See id. According to the police investigating the crime, the mayor did not actually possess a bomb. See id. Friends and colleagues believe that his actions were the product of chronic depression related to personal and financial troubles. See Raphael Lewis & Lisa Sandberg, Depression Tied to Bank Robbery, Philadelphia Inquirer, Dec. 30, 1997, at B1, B6.

If this were a federal case (it is not and will not be),[9] a district court would have no grounds under the majority's opinion to depart downwards on grounds of diminished capacity. More specifically, it would have no grounds to depart even if it found beyond cavil that the defendant's actions were prompted by a deep psychological disturbance and that there was no real threat of violence. In my view that makes no sense.

_____

9. I am informed by the United States Attorney that the mayor is being prosecuted in state court, and that he will not be prosecuted in federal court.

For all the foregoing reasons, I respectfully dissent. Judge Nygaard and Judge Roth join in this dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit